## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009

     Plaintiff,

     v.

DRONE ADVISORY COMMITTEE; FEDERAL
AVIATION ADMINISTRATION; DANIEL K.
ELWELL, in his official capacity as Acting Administrator
of the Federal Aviation Administration and Designated
Federal Officer of the Drone Advisory Committee and
RTCA Advisory Committee;
800 Independence Avenue, S.W.
Washington, D.C. 20591

RTCA ADVISORY COMMITTEE;
1150 18th Street, N.W.
Suite 910
Washington, D.C. 20036

UNITED STATES DEPARTMENT OF
TRANSPORTATION; DAVID W. FREEMAN, in his
official capacity as Committee Management Officer of the
Department of Transportation;
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

     Defendants.

Civ. Action No.   18-833  

## COMPLAINT FOR INJUNCTIVE RELIEF

1.    This is an action under the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2;

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706; and the Declaratory Judgment

Act, 28 U.S.C. § 2201(a), for injunctive and other appropriate relief to compel the Drone

Advisory Committee ("DAC" or "Committee") to comply with its transparency obligations.

2.      Plaintiff Electronic Privacy Information Center ("EPIC") specifically challenges (a) Defendants' failure to make advisory committee meetings "open to the public," as required by 5 U.S.C. app. 2 § 10(a)(1); and (b) Defendants' failure to make "available for public inspection and copying" the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents" of the DAC, as required by 5 U.S.C. app. 2 § 10(b).

3.      Access to these nonpublic meetings and records would reveal how, if at all, the Drone Advisory Committee has addressed the threat that the deployment of Unmanned Aerial Vehicles ("UAVs" or "aerial drones" or simply "drones") would pose to the privacy rights of persons in the United States.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, and 5 U.S.C. § 704. This Court has personal jurisdiction over Defendants.

5.      Venue is proper in this district under 5 U.S.C. § 703 and 28 U.S.C. § 1391.

## Parties

6.      Plaintiff EPIC is a nonprofit organization, incorporated in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues. Central to EPIC's mission is oversight and analysis of government activities that impact individual privacy. EPIC is a membership organization. The Members of EPIC's Advisory Board include distinguished experts in law, technology, and public policy.

7.      EPIC is the leading organization in the United States addressing the privacy issues that arise from the deployment of drones in the National Airspace System ("NAS"). As early as 2005,

EPIC warned the public and policymakers about the adverse impact that drone surveillance would have on individual privacy.[1]

8.     EPIC filed a petition with the FAA in 2012—joined by over 100 organizations, experts, and members of the public—demanding that the agency issue privacy regulations to safeguard the interests of the American public.[2] EPIC has also twice brought suit against the FAA to enforce the agency's obligation to establish privacy protections against drone surveillance. EPIC first sued the FAA when the agency denied EPIC's 2012 petition and failed to address privacy issues in its first drone rulemaking. *EPIC v. FAA*, 821 F.3d 39 (D.C. Cir. 2016). EPIC subsequently filed suit to challenge the FAA's final rule on small drones, a case which is currently pending before the U.S. Court of Appeals for the D.C. Circuit. *EPIC v. FAA*, No. 16-1297 (D.C. Cir. argued Jan. 25, 2018).

9.     EPIC recently filed a Freedom of Information Act ("FOIA") suit against the Department of Homeland Security to obtain the agency's drone policies, reports, and procedures. *EPIC v. DHS*, No. 18-545 (D.D.C. filed Mar. 8, 2018). In 2016, EPIC obtained key documents through a FOIA request concerning the work of the FAA's Drone Registration Task Force.[3] And in 2015, an EPIC FOIA case identified significant privacy and maintenance problems with the Department of Defense JLENS program, in which the Department conducted domestic surveillance using blimp-mounted radar and video equipment. *EPIC v. Dep't of the Army*, No.

---

[1] EPIC, *Spotlight on Surveillance: Unmanned Planes Offer New Opportunities for Clandestine Government Tracking* (Aug. 2005), https://epic.org/privacy/surveillance/spotlight/0805/.
[2] EPIC, *EPIC Petition Demands that FAA Protect Privacy and Regulate Drones* (2012), https://epic.org/2012/02/epic-petition-demands-that-FA.html.
[3] EPIC, *EPIC v. Department of Transportation - Drone Registration Task Force* (2016), https://epic.org/foia/dot/drones/taskforce/.

14–776 (D.D.C. filed May 6, 2014). After a JLENS surveillance blimp broke free, downed

multiple power lines, and crash-landed in Pennsylvania, the program was eventually cancelled.[4]

10.     EPIC maintains one of the most popular privacy websites in the world, https://epic.org,

which provides EPIC's members and the public with access to current information about

emerging privacy and civil liberties issues. EPIC's website includes extensive information about

the privacy risks arising from drone surveillance. EPIC frequently posts documents obtained

under the FOIA and other open government statutes in order to educate the public about the

privacy implications of government programs and activities.

11.     Defendant Drone Advisory Committee ("DAC") is an advisory committee of the United

States government within the meaning of 5 U.S.C. app. 2 § 3(2). Ex. 1 at 3.[5] The DAC was

established and is utilized by the Federal Aviation Administration ("FAA") and the United States

Department of Transportation ("DOT"). The DAC includes a Drone Advisory Subcommittee

("DACSC" or "Subcommittee") and at least three task groups: Task Group 1, Task Group 2, and

Task Group 3 (collectively, "DAC Task Groups" or "Task Groups"). The DAC, the DACSC, and

the DAC Task Groups are all under and part of the RTCA Advisory Committee ("RTCA").

12.     Defendant RTCA Advisory Committee is an advisory committee of the United States

government within the meaning of 5 U.S.C. app. 2 § 3(2). The RTCA is utilized—and was

established as a federal advisory committee—by both the FAA and the DOT. The RTCA is also

an umbrella organization comprising at least 26 constituent advisory committees, including the

DAC.[6]

---

[4] EPIC, *EPIC v. Army - Surveillance Blimps* (2017), https://epic.org/foia/army/.
[5] RTCA, *Terms of Reference: Drone Advisory Committee (DAC)* (July 27, 2017).
[6] *DOT - 699 - RTCA Advisory Committee - Agency Authority - ( Verify/Review By: None )
Subcommittees*, FACA Database, https://www.facadatabase.gov/subcommittee/
subcommittees.aspx?cid=619.

13.     Defendant Federal Aviation Administration is an agency within the meaning of 5 U.S.C. § 701, 5 U.S.C. § 551, and 5 U.S.C. app. 2 § 3(3). The FAA is also a sub-agency of the DOT.

14.     Defendant Daniel K. Elwell is the Acting Administrator of the FAA. Mr. Elwell is also the Designated Federal Officer ("DFO") of the DAC and the RTCA within the meaning of 5 U.S.C. app. 2 § 10(e)–(f).

15.     Defendant United States Department of Transportation is an agency within the meaning of 5 U.S.C. § 701, 5 U.S.C. § 551, and 5 U.S.C. app. 2 § 3(3).

16.     Defendant David W. Freeman is the Committee Management Officer ("CMO") of the DOT within the meaning of 5 U.S.C. app. 2 § 8(b). Mr. Freeman is responsible for controlling and supervising the DAC, the RTCA, and the DFO of both committees (currently Mr. Elwell). *Id.*

## **Facts**

### The Growing Privacy Risks Posed by Drones

17.     The integration of drones into the National Airspace System will adversely affect millions of Americans. Reports of drones threatening the safety of aircraft, civilians, first responders, and law enforcement officers—as well as reports of surveillance by drones on private property and "drone stalking"—are increasing.[7]

---

[7] *See, e.g.*, Alan Levin, *Drone-Plane Near Misses, Other Incidents Surge 46% in U.S.*, Bloomberg (Feb. 23, 2017), https://www.bloomberg.com/news/articles/2017-02-23/drone-plane-near-misses-other-incidents-surged-46-in-u-s; Jonathan Lai, *In New Jersey, new rules on flying drones*, Philadelphia Inquirer (Jan. 19, 2018), http://www.philly.com/philly/news/drone-law-nj-new-regulations-20180122.html; Grant Schulte, *Bill Seeks to Stop Drone Use to Spy on People, Harass Cows*, Associated Press (Jan. 7, 2018), https://www.apnews.com/3ec967603590495 c870f5dd2065a218a; Michael Chen, *Sunbathing woman outraged over 'lingering' drone over her backyard*, ABC2 (June 28, 2017), https://www.abc2news.com/news/national/encinitas-sunbather-confronts-drone-in-her-yard; Jamie Seidel, *Amazon wants to use delivery drones to stalk your house*, N.Y. Post (July 27, 2017), https://nypost.com/2017/07/27/amazon-wants-to-use-delivery-drones-to-stalk-your-house/; Nick Bilton, *When Your Neighbor's Drone Pays an*

18.     Many operators enable their drones to surreptitiously observe, record, or otherwise collect information from individuals without their knowledge or consent, even through walls or from thousands of feet in the air.[8]

19.     Drones are routinely equipped with high definition cameras that greatly increase the capacity for domestic surveillance.[9] Drones can also gather sensitive, personal information using infrared cameras, heat sensors, GPS, automated license plate readers, facial recognition devices, and other sensors.[10] Drones are even "capable of locking-on to an individual and following them while shooting video and avoiding obstacles," including in "a dense forest or urban environments like a warehouse."[11]

20.     Drone use and drone sales are rapidly growing. U.S. drone sales more than doubled between 2016 and 2017,[12] and commercial drones are representing an ever-larger share of the worldwide drone market.[13] Meanwhile, President Trump has taken steps to effect a "quick and dramatic expansion of drone use" in the NAS.[14]

---

*Unwelcome Visit*, N.Y. Times (Jan. 27, 2016), https://www.nytimes.com/2016/01/28/style/neighbors-drones-invade-privacy.html.

[8] Petition for Rulemaking from EPIC to FAA at 2–4 (March 8, 2012) (FAA-2012-0306-0001), *available at* https://epic.org/apa/lawsuit/EPIC-FAA-Drone-Petition-March-8-2012.pdf.

[9] *Id.* at 2.

[10] *Id.* at 2–3.

[11] Lucas Matney, *Skydio's $2499 'self-flying' drone knows where you are and where you're going*, TechCrunch (Feb. 13, 2018), https://techcrunch.com/2018/02/13/skydios-2499-self-flying-drone-knows-where-you-are-and-where-youre-going/.

[12] April Glaser, *U.S. drone sales have more than doubled from last year*, Recode (Apr. 10, 2017), https://www.recode.net/2017/4/10/15245234/us-drone-sales-doubled-from-last-year.

[13] *Commercial drones are the fastest-growing part of the market,* The Economist (June 10, 2017), https://www.economist.com/news/technology-quarterly/21723003-most-drones-today-are-either-cheap-toys-or-expensive-weapons-interesting.

[14] Michael Laris, *Trump administration to allow quick and dramatic expansion of drone use*, Wash. Post (Oct. 25, 2017), https://www.washingtonpost.com/local/trafficandcommuting/trump-administration-establishing-innovation-zones-for-widespread-drone-use/2017/10/25/a004b400-b990-11e7-9e58-e6288544af98_story.html; *see also Unmanned Aircraft Systems Integration*

21.     Despite these alarming trends, the FAA has refused to promulgate generally applicable regulations to address the privacy risks posed by drones—even ignoring a Congressional command to do so in the FAA Modernization and Reform Act of 2012.[15]

22.     The Drone Advisory Committee, which directly advises the FAA on drone deployment, has the obligation to present to the FAA proposals and recommendations to address widespread and obvious public concerns about the impending risks of drone surveillance in the United States.

23.     Yet there is no evidence that the DAC has fulfilled its essential responsibility to assess these risks to the public interest. References to privacy are extremely sparse in the few public DAC records, while the vast majority of DAC records and subcommittee meetings remain closed to the public in violation of the FACA.

<u>The Formation and Structure of the DAC</u>

24.     On May 4, 2016, then-FAA Administrator Michael Huerta stated that the FAA was "establishing" the DAC, which he described as "a broad-based advisory committee that will provide advice on key unmanned aircraft integration issues." Ex 2.[16]

25.     The DAC was in fact "established" by the FAA on or before August 31, 2016. Ex. 3.[17] The DAC was "formed under the RTCA federal advisory committee." *Id.*

---

*Pilot Program: Memorandum for the Secretary of Transportation*, 82 Fed. Reg. 50,301 (Oct. 25, 2017).

[15] Pub. L. 112-95, 126 Stat. 11 (2012); *see also* EPIC, *EPIC v. FAA* (2018), https://epic.org/privacy/litigation/apa/faa/drones/.

[16] Press Release, FAA, FAA Administrator Makes Two Major Drone Announcements (May 4, 2016).

[17] Press Release, FAA, Drone Advisory Committee to Hold Inaugural Meeting (Aug. 31, 2016).

26.     The chairman and the original members of the DAC were appointed by the FAA on or before August 31, 2016. *Id.* The Committee held its first public meeting on September 16, 2016, in Washington, D.C. Ex. 4.[18]

27.     As of March 2018, the DAC was comprised of thirty-two members. Ex. 14.[19] Eighteen Committee members are affiliated with corporations or organizations engaged in the design, manufacture, operation, or management of drones. *Id.* Nine members are affiliated with traditional aircraft operators, airport authorities, or associations of aviation professionals. *Id.* Two members are university-affiliated researchers, and three members are public officials (only one of whom is elected). *Id.* No privacy, consumer safety, or other general public interest groups are represented on the DAC.

28.     The DAC Terms of Reference—which the FAA "issued," Ex. 10 at 4[20]—charge the DAC with providing an "open venue" for Committee members to "identify and recommend a single, consensus-based set of resolutions for issues regarding the efficiency and safety of integrating UAS [unmanned aircraft systems] into the NAS and to develop recommendations to address those issues and challenges." Ex. 1 at 2.

29.     According to the FAA, DAC members are to "discuss key issues and challenges associated with integrating unmanned aircraft in the world's busiest and most complicated airspace system." Ex. 2. However, the Committee is to "conduct more detailed business through a subcommittee and various task groups that will help the FAA prioritize its activities, including the development of future regulations and policies." *Id.*

---

[18] RTCA, *DAC Meeting September 16, 2016 Meeting Minutes* (Sep. 26, 2018).
[19] RTCA, *Drone Advisory Committee Membership* (Mar. 2018).
[20] RTCA, *Drone Advisory Committee May 3, 2017 Meeting Minutes* (May 15, 2017).

30.     The DAC Subcommittee was established at some point between the first full DAC meeting (September 16, 2016), Ex. 4, and the second full DAC meeting (January 31, 2017), Ex. 5.[21] The date of the Subcommittee's first meeting, as with nearly all DACSC proceedings, was not announced and is not publicly known.

31.     The DACSC Terms of Reference—which the FAA "issued," Ex. 10 at 4—state that the Subcommittee's role is to "support" the DAC, to "present findings to DAC," and to "[f]orward recommendations and other deliverables to DAC for consideration." Ex. 6 at 1, 3.[22] However, contrary to the DACSC Terms of Reference, FAA officials have repeatedly circumvented the full DAC and worked directly with the Subcommittee.

32.     For example, FAA officials have "brief[ed]" and "educat[ed]" the DACSC, Ex. 10 at 8; provided "guidance and assistance to the DAC Subcommittee," Ex. 11 at 2;[23] and personally participated in multiple DAC meetings at which the Subcommittee delivered reports on its work. *See, e.g.*, Ex. 5 at 2–3; Ex. 10 at 3–4, 8; Ex. 12 at 2, 7.[24]

33.     Moreover, the DAC's Designated Federal Officer—previously Acting FAA Deputy Administrator Victoria B. Wassmer, now Acting Administrator Elwell—is required by both the RTCA Charter and the FACA to be intimately involved in the proceedings of the DACSC. The "DFO or alternate" must "[c]all, attend, and adjourn all the committee/ subcommittee meetings"; "[a]pprove all committee/subcommittee agendas"; and "[c]hair meetings when directed to do so by the FAA Administrator." Ex. 13 at 2–3;[25] *see also* 5 U.S.C. app. 2 § 10(e)–(f).

---

[21] RTCA, *Drone Advisory Committee (DAC) Meeting Minutes* (Feb. 8, 2017).
[22] RTCA, *Terms of Reference: Drone Advisory Subcommittee* (Oct. 26, 2016).
[23] RTCA, *Drone Advisory Committee (DAC) July 21, 2017 Meeting Minutes* (July 25, 2017).
[24] RTCA, *Drone Advisory Committee (DAC) November 8, 2017 Meeting Minutes* (Nov. 15, 2017).
[25] RTCA Charter, FAA Order No. 1110.77Y (Mar. 29, 2018).

34.     The DAC also includes at least three "FAA-approved Task Groups," each of which must "have a specific, limited charter" that is "approved by the FAA Administrator." Ex. 1 at 2. According to the FAA, the agency's "traditional way of providing tasking" to Task Groups is to "finalize and approve the tasking statement and forward it to the [Committee] to execute." Ex. 5 at 10.

35.     Task Group 1 was established at some point between the first full DAC meeting (September 16, 2016), Ex. 4, and the second full DAC meeting (January 31, 2017), Ex. 5. The FAA instructed Task Group 1 to "[d]evelop a set of consensus based recommendations" concerning "the roles and responsibilities of federal, state, and local governments in regulating and enforcing drone laws." Ex. 7 at 7.[26]

36.     Task Group 2 was also established at some point between the first full DAC meeting (September 16, 2016), Ex. 4, and the second full DAC meeting (January 31, 2017), Ex. 5. The FAA instructed Task Group 2 to "provide recommendations on UAS operations/missions beyond those currently permitted" and "define procedures for industry to gain access to the airspace." Ex. 8 at 1.[27]

37.     Task Group 3 was established sometime between the second full DAC meeting (January 31, 2017), Ex. 5, and the third full DAC meeting (May 3, 2017), Ex. 10. The FAA instructed Task Group 3 to "develop recommendations as to the UAS community's preferred method(s) for

---

[26] Tasking Statement from Victoria B. Wassmer, Acting Deputy Adm'r, FAA, to DAC Task Group 1 (Jan. 31, 2017).
[27] Tasking Statement from Victoria B. Wassmer, Acting Deputy Adm'r, FAA, to DAC Task Group 2 (Jan. 31, 2017).

funding Federal activities and services required to support UAS operations for the next two years, and beyond." Ex. 9 at 1.[28]

38.    The DACSC Terms of Reference nominally require the Task Groups to perform their work "at the direction of the DACSC," Ex. 6 at 3, rather than at the direction of FAA officials. In October 2017, Mr. Elwell, then the FAA Deputy Administrator, explained to the Washington Post: "If we [the FAA] meddle, if we get in there, they're not advising us." Ex. 20.[29] Nevertheless, FAA officials have personally directed, guided, participated in, and received the work and recommendations of the Task Groups.

39.    For example, in early 2017, Acting Deputy Administrator Wassmer "issued" the detailed tasking statements for all three Task Groups. Ex. 10 at 4. The tasking statements included fact-finding assignments for each Task Group, topics that each Task Group should advise on, and deadlines by which each Task Group should deliver its recommendations and reports. *See* Ex. 7; Ex. 8; Ex. 9. As Wassmer made clear to the DAC, "tasking statements from the FAA should guide the work of the DAC, DACSC, and TGs." Ex. 10 at 4.

40.    Wassmer and Acting Administrator Elwell also personally attended DAC meetings at which the Task Groups delivered substantive recommendations and reports. *See*, *e.g.*, Ex. 10 at 2, 9–17; Ex. 11 at 1, 3–9; Ex. 12 at 2, 8–18.

41.    And because the Task Groups constitute subcommittees of the DAC, Wassmer and Elwell were (or are) required to be intimately involved in the proceedings of the Task Groups in their capacity as Designated Federal Officer. Under the RTCA Charter, the "DFO or alternate"

---

[28] Tasking Statement from Victoria B. Wassmer, Acting Deputy Adm'r, FAA, to DAC Task Group 3 (Mar. 7, 2017).
[29] Michael Laris, *A U.S. drone advisory group has been meeting in secret for months. It hasn't gone well.*, Wash. Post (Oct. 23, 2017).

must "[c]all, attend, and adjourn all the committee/ subcommittee meetings"; "[a]pprove all committee/subcommittee agendas"; and "[c]hair meetings when directed to do so by the FAA Administrator." Ex. 13 at 2–3; *see also* 5 U.S.C. app. 2 § 10(e)–(f).

### The Transparency Obligations of the DAC

42.     The DAC, according its Terms of Reference, must conduct its work in the "open, transparent venue of a federal advisory committee (FAC). As with all FACs, the Drone Advisory Committee (DAC) will be designed to: ensure transparency, include broad and balanced representation across the industry, encourage innovation and remain consistent with US anti-trust laws." Ex. 1 at 1.

43.     Under the FACA, the meetings of each advisory committee—defined as any "committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" which is "established or utilized" by an agency—"shall be open to the public." 5 U.S.C. app. 2 §§ 3(2), 10(a)(1).

44.     The Charter of the RTCA—of which the DAC, the DACSC, and the DAC Task Groups are all part—confirms that "RTCA Advisory Committee and subcommittee meetings will be open to the public, except as provided by section 10(d) of the FACA and applicable regulations. Meetings will be announced in the Federal Register at least 15 days before each meeting, except in emergencies." Ex. 13 at 3.

45.     The DAC Terms of Reference further underscore that "The DAC functions as a Federal advisory committee with meetings that are open to the public, unless otherwise noted as authorized by section 10(d) of the FACA and applicable regulations . . . ." Ex. 1 at 3.

46.     Under the FACA, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by

each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist." 5 U.S.C. app. 2 § 10(b).

47.     The RTCA Charter confirms that "[s]ubject to the Freedom of Information Act, 5 U.S.C. § 552, records, reports, transcripts, minutes, or meeting summaries, and other materials presented to or prepared for the RTCA Advisory Committee are available for public inspection." Ex. 13 at 4.

48.     The DAC Terms of Reference state that "[i]n accordance with the Federal Advisory Committee Act, meeting summaries and related information will be available to the public via RTCA's website. Documents undergoing final review can be obtained by contacting RTCA." Ex. 1 at 6.

49.     The RTCA Charter also states that the "records of the committee, formally and informally established subcommittees, or other work or task subgroup of the subcommittee, shall be handled in accordance with the General Records Schedule 6.2, or other approved agency records disposition schedule." *Id.*

50.     General Records Schedule 6.2 "covers Federal records created or received by Federal advisory committees and their subgroups pursuant to the Federal Advisory Committee Act (FACA) of 1972 (5 U.S.C., Appendix, as amended) and records related to the management of these committees by their sponsoring agencies or departments." Nat'l Archives & Records Admin., *General Records Schedule 6.2: Federal Advisory Committee Records* 130 (Sep. 2016), Ex. 15.

51.     General Records Schedule 6.2 requires the "[p]ermanent" preservation of "records related to the establishment of the committee"; "records related to committee membership";

"records of committee meetings and hearings"; "records related to committee findings and recommendations"; "records created by committee members," including "correspondence documenting discussions, decisions, or actions related to the work of the committee"; "records related to research collected or created by the committee"; "documentation of advisory committee subcommittees"; "records that document the activities of subcommittees that support their reports and recommendations to the chartered or parent committee." *Id.* at 130–32.

52.     The General Services Administration, which is "responsible for all matters relating to advisory committees," and "prescribe[s] administrative guidelines and management controls applicable to advisory committees,"  5 U.S.C. app. 2 § 7, instructs that: "Whether subcommittees are open to the public or not, the agency must . . . [c]omply with recordkeeping requirements (i.e., minutes)" and "[a]llow public access to subcommittee records." *Federal Advisory Committee Act Training Course* 192 (2017), Ex 16.

53.     FACA regulations also dictate that a committee or agency "may not require members of the public or other interested parties to file requests for non-exempt advisory committee records under the request and review process established by section 552(a)(3) of FOIA." 41 C.F.R. § 102-3.170.

### The Activities of the DAC and DAC Subcomponents

54.     On September 16, 2016, the DAC held its first full Committee meeting in Washington, D.C. Ex. 4. Acting Deputy Administrator Wassmer, then the Committee's DFO, attended the meeting and delivered remarks. *Id.* at 1.

55.     DAC Secretary Al Secen presented the results of a survey of DAC members at the September 2016 meeting. *DAC members identified privacy as the second-highest public concern around drones, narrowly trailing safety and reliability:*



56.    Yet in the same survey, DAC members ranked privacy dead last among their regulatory and policy concerns:



57.     During the September 2016 meeting, the DAC identified as an action item: "Establish a WG to describe the privacy concerns, and to identify the respective roles and responsibilities for dealing with privacy concerns across local, state, regional and federal entities." However, there is no public record of the DAC ever forming a working group focused on privacy.

58.     During the same meeting, the DAC also identified "[e]stablishing a standing DAC Subcommittee," "[e]stablish[ing] a task group" as action items. Ex. 4 at 2.

59.     Between the DAC's September 2016 and January 2017 meetings, the DACSC, Task Group 1, and Task Group 2 were formed and began engaging in official Committee business. *See* Ex. 5 at 2–7.

60.     Although members of the DACSC and the Task Groups met and conferred during this period, *see id.*, Defendants failed to publicly notice or announce any such meetings.

61.     Defendants have also failed to make any DACSC or Task Group records from this period available for public inspection, apart from limited information presented to the DAC at its January 2017 meeting.

62.     On January 31, 2017, the DAC held its second full Committee meeting in Reno, Nevada. Ex. 5. Acting Deputy Administrator Wassmer, then the Committee's DFO, attended the meeting and delivered remarks. *Id.* at 1.

63.     The DACSC, Task Group 1, and Task Group 2 each delivered a progress report to the DAC at the January 2017 meeting. *Id.* at 2–7. Task Group 1 and Task Group 2 discussed their substantive recommendations to the FAA. *Id.* at 3–7. The DAC also "approved the DACSC to go through the process of creating TG3 [Task Group 3]" based on the tasking statement issued by the FAA. *Id.* at 10.

64.     According to the publicly available records of the January 2017 meeting, the privacy implications of drones were referenced only once in passing.

65.     Between the DAC's January 2017 and May 2017 meetings, the DACSC, Task Group 1, and Task Group 2 continued engaging in official Committee business. *See* Ex. 10 at 8–14. Task Group 3 was also formed during this period and began engaging in official Committee business. *See id.* at 14–16.

66.     Although members of the DACSC and the Task Groups met and conferred during this period, *see* Ex. 10 at 8–16, Defendants failed to publicly notice or announce any such meetings.

67.     Defendants have also failed to make any DACSC or Task Group records from this period available for public inspection, apart from limited information presented to the DAC at its May 2017 meeting.

68.     On May 3, 2017, the DAC held its third full Committee meeting in Herndon, Virginia. Ex. 10. Acting Deputy Administrator Wassmer, then the Committee's DFO, attended the meeting and delivered remarks. *Id.* at 1.

69.     The DACSC and each of the Task Groups delivered a progress report to the DAC at the May 2017 meeting. *Id.* at 8–16. Task Group 1 and Task Group 2 discussed their substantive recommendations to the FAA. *Id.* at 8–14.

70.     According to the publicly available records of the May 2017 meeting, the privacy implications of drones were referenced only twice in passing.

71.     Between the DAC's May 2017 and July 2017 meetings, the DACSC and the Task Groups continued engaging in official Committee business. *See* Ex. 11 at 3–9.

72.     Although members of the DACSC and the Task Groups met and conferred during this period, *see id.*, Defendants failed to publicly notice or announce any such meetings.

73.     Defendants have also failed to make any DACSC or Task Group records from this period available for public inspection, apart from limited information presented to the DAC at its July 2017 meeting.

74.     On July 21, 2017, the DAC held its fourth full Committee meeting via digital conference. Ex. 11. Mr. Elwell, then the FAA Deputy Administrator, attended the meeting as the Committee's newly appointed DFO. *Id.* at 2. Elwell also delivered remarks during the meeting. *Id.* at 2–3.

75.     Task Group 1 and Task Group 3 both delivered a progress report and recommendations to the DAC at the July 2017 meeting. *Id.* at 3–9. Task Group 3 also presented an interim report intended for the FAA concerning funding mechanisms for the introduction of drones into the NAS. *Id.* at 3–7.

76.     San Francisco Mayor Ed Lee, who served on the DAC until his death in December 2017, sent a representative to the July 2017 meeting to speak on his behalf. The representative told the DAC that Mayor Lee "remained concerned about privacy and ensuring broader input in the [DAC] discussion from partners such as law enforcement agencies and other local government representatives. The desire is to have an equal, one-to-one representation of local government to industry members."

77.     According to the publicly available records of the July 2017 meeting, Mayor Lee's statement was the sole reference made by the DAC to the privacy implications of drones.

78.     During the July 2017 meeting, the DAC approved the interim funding report presented by Task Group 3. The RTCA officially delivered the Task Group 3 report to then-Deputy

Administrator Elwell on September 11, 2017. Ex. 17.[30] The RTCA Advisory Committee does not appear to have collectively reviewed or approved the Task Group 3 report before transmitting it to the FAA.

79.     Between the DAC's July 2017 and November 2017 meetings, the DACSC and the Task Groups continued engaging in official Committee business. *See* Ex. 12 at 8–18.

80.     Although members of the DACSC and the Task Groups met and conferred during this period, *see id.*, Defendants failed to publicly notice or announce any meetings.

81.     Defendants have also failed to make any DACSC or Task Group records from this period available for public inspection, apart from limited information presented to the DAC at its November 2017 meeting.

82.     On October 23, 2017, the Washington Post published a report that Task Group 1—a group that includes "industry insiders with a financial stake in the outcome" of the Committee process—"has been holding confidential meetings to shape U.S. policy on drones, deliberating privately about who should regulate a burgeoning industry that will affect everything from package delivery to personal privacy." Ex. 21.[31]

83.     The Washington Post also reported that the Task Group 1 process had "been riven by suspicion and dysfunction" and that "[m]onths of tensions came to a head" when "an FAA contractor that manages the group told members they had to sign a far-reaching confidentiality agreement to keep participating. After some raised concerns, several groups were blocked from

---

[30] Letter from Margaret Jenny, President, RTCA, to Daniel K. Elwell, Deputy Adm'r, FAA (Sep. 11, 2017).
[31] Michael Laris, *Federal Drone Advisory Panel Knocked for 'Lack of Transparency and Poor Management'*, Wash. Post (Nov. 8, 2017).

receiving draft documents meant to represent their own 'common ground' positions, emails show." *Id.*

84.     On November 8, 2017, Mayor Ed Lee sent a letter to DAC Chairman Brian Krzanich warning that "Task Group 1's process has been marred by a lack of transparency and poor management," including "lack of agendas, last minute rescheduling of meetings, failure to have minutes of any proceedings, conflicting advice and guidance by RTCA and Requirements to sign documents that public employees cannot sign." Ex. 19 at 1. Mayor Lee added: "Additionally, there is a stark imbalance of perspectives and viewpoints favoring industry interests at the expense of local and state governments and members of the public. Because the process was flawed, the recommendations produced by that process are also flawed." *Id.*

85.     On the same day—November 8, 2017—the DAC held its fifth full Committee meeting at the Amazon Meeting Center in Seattle, Washington. Ex. 12. Mr. Elwell, then the FAA Deputy Administrator, attended the meeting and delivered remarks. *Id.* at 2–6.

86.     The DACSC and each of the Task Groups delivered a progress report to the DAC at the November 2017 meeting. *Id.* at 7–18. Each Task Group discussed its substantive recommendations to the FAA. *Id.* at 8–14.

87.     Task Group 2 also presented a final report intended for the FAA concerning drone access to airspace. *Id.* at 12–16. The DAC approved the report. *Id.* at 16.

88.     According to the publicly available records of the November 2017 meeting, the privacy implications of drones were referenced only four times: once in a question posed to Task Group 2 and three times in a presentation about local government views on drone deployment.

89.     On information and belief, the DACSC and the DAC Task Groups have continued to meet, confer, and engage in official Committee business since the November 2017 meeting.

90.     Defendants have failed to publicly notice or announce any meetings of the DACSC or the DAC Task Groups from this period.

91.     Defendants have also failed to make any DACSC or Task Group records from this period available for public inspection.

92.     On March 9, 2018, the DAC held its sixth full Committee meeting in McLean, Virginia. *Sixth Drone Advisory Committee (DAC) Meeting*, 83 Fed. Reg. 7,284, 7,284 (Feb. 20, 2018).

93.     To date, Defendants have failed to release minutes from the March 2018 meeting. However, Acting Administrator Elwell was scheduled to attend and speak at the meeting as the Committee's DFO. *Id.*

94.     The DAC's next full Committee meeting is scheduled for July 17, 2018. *Drone Advisory Committee (DAC)*, RTCA (2018).[32]

<u>EPIC's Attempts to Obtain DAC Records</u>

95.     On March 20, 2018, EPIC sent a records request via email to Acting FAA Administrator Elwell, DOT Committee Management Officer David W. Freeman, DAC Secretary Al Secen, and the RTCA's general information email address. Ex. 18.

96.     In its request, EPIC stated that it wished to access "all 'records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by' the DAC or any DAC subcomponent. 5 U.S.C. App. 2 § 10(b)." *Id.*

97.     EPIC asked the agency and Committee recipients to "direct EPIC to the URL or location where the full collection of DAC and DAC subcomponent records is available for public inspection and copying." *Id.*

---

[32] https://www.rtca.org/content/drone-advisory-committee.

98.    EPIC also advised the FAA, DAC, and RTCA of its records disclosure obligations under the FACA. *Id.*

99.    As of April 11, 2018, EPIC has received no response to its request.

100.    On April 6, 2018, EPIC Counsel John Davisson called and left a voicemail message for DAC Secretary Al Secen. Mr. Davisson reiterated EPIC's desire to obtain access to DAC records and left a return number for Mr. Secen to call.

101.    As of April 11, 2018, EPIC has received no response to this message.

## Count I

### Violation of the FACA: Failure to Open Meetings to the Public

102.    Plaintiff asserts and incorporates by reference paragraphs 1–101.

103.    Defendants have failed to open meetings of the DACSC and DAC Task Groups to the public.

104.    Defendants' failure to open DACSC and DAC Task Group meetings to the public is a violation of 5 U.S.C. app. 2 § 10(a)(1).

105.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' violation of 5 U.S.C. app. 2 § 10(a)(1). By failing to open DACSC and DAC Task Group meetings, Defendants have frustrated Plaintiff's longstanding mission to educate the public about the privacy implications of drone deployment and about the federal government's efforts (or lack thereof) to protect the public from drone surveillance.

106.    Plaintiff has exhausted all applicable administrative remedies.

## Count II

### Violation of the APA: Agency Action Unlawfully Withheld

107.    Plaintiff asserts and incorporates by reference paragraphs 1–101.

108.    Defendants have failed to open meetings of the DACSC and DAC Task Groups to the

public, as required by 5 U.S.C. app. 2 § 10(a)(1).

109.    Defendants' failure to make these meetings open to the public constitutes agency action

unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

110.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' violation of

5 U.S.C. § 706(1). By failing to open DACSC and DAC Task Group meetings, Defendants have

frustrated Plaintiff's longstanding mission to educate the public about the privacy implications of

drone deployment and about the federal government's efforts (or lack thereof) to protect the

public from drone surveillance.

111.    Plaintiff has exhausted all applicable administrative remedies.

## Count III

### Violation of the APA: Unlawful Agency Action

112.    Plaintiff asserts and incorporates by reference paragraphs 1–101.

113.    Defendants have held numerous nonpublic meetings of the DACSC and DAC Task

Groups in violation of 5 U.S.C. app. 2 § 10(a)(1).

114.    By holding nonpublic meetings, Defendants have engaged in conduct that is arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. §

706(2)(a) and short of statutory right under 5 U.S.C. § 706(2)(c).

115.    Defendants' conduct constitutes final agency action under 5 U.S.C. § 704.

116.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' actions. By

holding nonpublic DACSC and DAC Task Group meetings, Defendants have frustrated

Plaintiff's longstanding mission to educate the public about the privacy implications of drone

deployment and about the federal government's efforts (or lack thereof) to protect the public from drone surveillance.

117.    Plaintiff has exhausted all applicable administrative remedies.

## Count IV

### Violation of the FACA: Failure to Make Records Available for Public Inspection

118.    Plaintiff asserts and incorporates by reference paragraphs 1–101.

119.    Defendants have failed to make "available for public inspection and copying" numerous "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the DAC, including but not limited to records arising out of the DACSC and DAC Task Groups. 5 U.S.C. app. 2 § 10(b).

120.    Plaintiff sought to inspect and copy these records, but Defendants did not make them available to Plaintiff.

121.    Defendants' failure to make these records available for inspection and copying is a violation of 5 U.S.C. app. 2 § 10(b).

122.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' violation of 5 U.S.C. app. 2 § 10(b). By failing to make numerous DAC records available for public inspection, Defendants have frustrated Plaintiff's longstanding mission to educate the public about the privacy implications of drone deployment and about the federal government's efforts (or lack thereof) to protect the public from drone surveillance.

123.    Plaintiff has exhausted all applicable administrative remedies.

## Count V

### Violation of the APA: Agency Action Unlawfully Withheld

124.    Plaintiff asserts and incorporates by reference paragraphs 1–101.

125.     Defendants have failed to make "available for public inspection and copying" numerous "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the DAC, including but not limited to records arising out of the DACSC and DAC Task Groups. 5 U.S.C. app. 2 § 10(b).

126.     Plaintiff sought to inspect and copy these records, but Defendants did not make them available to Plaintiff.

127.     Defendants' failure to make these records available to Plaintiff constitutes agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

128.     Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' violation of 5 U.S.C. § 706(1). By failing to make numerous DAC records available for public inspection, Defendants have frustrated Plaintiff's longstanding mission to educate the public about the privacy implications of drone deployment and about the federal government's efforts (or lack thereof) to protect the public from drone surveillance.

129.     Plaintiff has exhausted all applicable administrative remedies.

## Count VI

### Violation of the APA: Unlawful Agency Action

130.     Plaintiff asserts and incorporates by reference paragraphs 1–101.

131.     Since September of 2016, Defendants have held multiple meetings of the DAC, the DACSC, and the DAC Task Groups; engaged in substantive deliberations within and between the DAC, the DACSC, and the DAC Task Groups; issued official recommendations, reports, findings, and conclusions on behalf of the DAC, the DACSC, and the DAC Task Groups; assigned "action items" on behalf of the DAC to the FAA, the RTCA Advisory Committee, the DACSC, and the DAC Task Groups; and undertaken other official DAC business.

132.     Defendants have engaged in this conduct without making "available for public inspection and copying" numerous "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the DAC, including but not limited to records arising out of the DACSC and DAC Task Groups. 5 U.S.C. app. 2 § 10(b).

133.     Plaintiff sought to inspect and copy these records, but Defendants did not make them available to Plaintiff.

134.     By undertaking official Committee business without publicly disclosing records covered by U.S.C. app. 2 § 10(b), Defendants have engaged in conduct that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(a) and short of statutory right under 5 U.S.C. § 706(2)(c).

135.     Defendants' conduct constitutes final agency action under 5 U.S.C. § 704.

136.     Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' actions. By undertaking official Committee business without publicly disclosing numerous records covered by U.S.C. app. 2 § 10(b), Defendants have frustrated Plaintiff's longstanding mission to educate the public about the privacy implications of drone deployment and about the federal government's efforts (or lack thereof) to protect the public from drone surveillance.

137.     Plaintiff has exhausted all applicable administrative remedies.

## **Count VII**

### **Claim for Declaratory Relief Under 28 U.S.C. § 2201(a)**

138.     Plaintiff asserts and incorporates by reference paragraphs 1–101.

139.     Plaintiff is entitled under 28 U.S.C. § 2201(a) to a declaration of the rights and other legal relations of the parties with respect to the claims set forth in Counts I–VI.

## **Requested Relief**

WHEREFORE, Plaintiff requests that this Court:

A.  Order Defendants to preserve all records prepared for or by the DAC, including but not limited to records arising out of the DACSC and DAC Task Groups;

B.  Order Defendants to produce an index of all records prepared for or by the DAC, including but not limited to records arising out of the DACSC and DAC Task Groups;

C.  Order Defendants to make available for inspection and copying all records prepared for or by the DAC, including but not limited to records arising out of the DACSC and DAC Task Groups;

D.  Order Defendants to notice and open to the public all future meetings of the DACSC, DAC Task Groups, and any other DAC subcomponent hereafter established;

E.  Enjoin the DAC, DAC subcomponents, DAC officers, and DAC members from holding meetings; conducting deliberations; issuing recommendations, reports, findings, or conclusions; and engaging in other official DAC business until Defendants are in full compliance with 5 U.S.C. app. 2 § 10(a)(1) and § 10(b);

F.  Hold unlawful and set aside any actions, findings, and conclusions of the DAC, the DACSC, and the DAC Task Groups which predate Defendants' full compliance 5 U.S.C. app. 2 § 10(a)(1) and § 10(b);

G.  Award EPIC costs and reasonable attorney's fees incurred in this action; and

H.  Grant such other relief as the Court may deem just and proper.

Respectfully Submitted,

MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

/s/ Alan Butler
ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

JOHN DAVISSON, D.C. Bar #1531914[33]
EPIC Counsel

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: April 11, 2018

---

[33] Application to the bar of this Court pending since April 11, 2018.