## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) |
| Plaintiff; | ) ) |
| v. | ) **Civ. Action No. 18-833 (RC)** |
| DRONE ADVISORY COMMITTEE et al., | ) ) ) |
| Defendants. | ) ) |

## Reply Brief in Further Support of Defendants' Motion to Dismiss

### Table of Contents

Introduction ................................................................................................... 1

I.   The complaint fails to state a claim upon which relief can be granted. .............. 2

    A.   The complaint lacks plausible factual allegations supporting a claim that defendants have improperly withheld records of the Drone Advisory Committee. ...................................................................................... 2

    B.   The Drone Advisory Committee subgroups were not advisory committees in their own right. ................................................................. 11

II.  The court lacks jurisdiction over the complaint's open meeting claims and the direct Federal Advisory Committee Act and Declaratory Judgment Act claims. ........................................................................... 20

    A.   EPIC lacks particularized injury with respect to its open-meeting claims, and therefore cannot establish standing to pursue those claims.  20

    B.   EPIC cannot pursue direct claims under the Federal Advisory Committee Act or the Declaratory Judgment Act; nor does it properly name the RTCA and DAC advisory committees as defendants. ............... 23

Conclusion ...................................................................................................... 24

## Introduction

Despite the overall thrust of the allegations in its complaint, which focus on a lack of access to meetings and records of the Drone Advisory Committee's subgroups, *see* Compl. ¶¶ 30–41, 59–61, 65–67, 71–73, 79–81, 89–91, EPIC's opposition brief attempts to recast the complaint as primarily seeking records of the Drone Advisory Committee (DAC) itself. *See* Pl.'s Opp. to Defs.' Mot to Dismiss (Pl.'s Opp.) args. I(A), I(B). No matter. EPIC's complaint fails to state a claim upon which relief can be granted. The complaint includes insufficient factual allegations to support a claim that defendants violated the Administrative Procedure Act (APA) and Federal Advisory Committee Act (FACA) by failing to disclose DAC records that FACA required to be disclosed. To the contrary, the complaint's allegations demonstrate that defendants acted *in accordance* with FACA and its implementing regulations by disclosing records of the DAC and declining to disclose records of the DAC subgroups. EPIC's arguments that its complaint states valid claims for failure to disclose advisory-committee records lacks legal support.

With respect to the jurisdictional issues raised by defendants' motion to dismiss, EPIC's opposition brief all but concedes them. EPIC sets forth a contorted argument that EPIC sought  "advance" notice of the DAC subgroup meetings by submitting a records request *after* all meetings of the DAC (as then constituted) and its subcommittees had concluded, Pl.'s Op. 31, and then contends (contrary to Supreme Court and D.C. Circuit precedent) that it did not need to  "seek" to attend the meetings in any event, *id.* 32. But EPIC offers no other basis for finding that the complaint establishes a "particularized" informational injury, *cf. Friends of Animals v. Jewell*, 828 F.3d 989, 991, 992 (D.C. Cir. 2016); nor does it identify caselaw in which a court found a plaintiff to have established informational injury despite not having sought and been denied access to the information at issue.

EPIC offers similarly weak arguments in opposition to defendants' contention that neither FACA nor the Declaratory Judgment Act provide a direct cause-of-action. EPIC relies on pre-*Sandoval* cases to argue that FACA provides a direct cause-of-action, Pl.'s Opp. 33–34, ignoring the reality that "[s]ince *Sandoval*, courts in the D.C. Circuit have largely held that FACA does not provide a cause of action, given that none is apparent from the statutory text. " *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017); *see also* Defs.' Mem. 19 (citing cases). EPIC cites no caselaw whatsoever in arguing that the Declaratory Judgment Act provides a cause of action.

## I. The complaint fails to state a claim upon which relief can be granted.

### A. The complaint lacks plausible factual allegations supporting a claim that defendants have improperly withheld records of the Drone Advisory Committee.

EPIC's opposition contends that defendants "artificially narrow[ed] EPIC's Complaint" by "argu[ing] that EPIC seeks the release only of '*subgroup documents*,'" as opposed to records of the Drone Advisory Committee (DAC) itself. Pl.'s Mem. 15. Not so. Defendants' opening brief acknowledged that Counts IV, V, and VI of the complaint "assert that defendants failed 'to make available for public inspection and copying numerous *records*' of the '*DAC, including but not limited to* records arising out [the DAC subgroups]." Defs.' Mem. 13 (emphasis added); see also *id.* 12 (describing EPIC's record request as seeking "unspecified records of *the Drone Advisory Committee <u>and</u>* its subgroups ") (emphasis added). True, defendants' opening brief focused on EPIC's lack of legal entitlement to access the DAC subgroups' meetings and records, but only because the thrust of the allegations in EPIC's complaint concentrated on defendants' failure to hold open DAC-subgroup meetings and to disclose subgroup records. *See, e.g.*, Compl. ¶¶ 59–61, 65–67, 71–73, 79–81, 82–84, 89–91 (all describing instances in which defendants allegedly "failed

to publicly notice or announce any [DAC subgroup] meetings, " or to "make any [DAC subgroup] records available for public inspection "). Defendants have moved to dismiss all claims in EPIC's complaint, including any claims relating to the records of the DAC itself. *See* Defs.' Mot 1; *see also* Defs.' Mem. 13–14, 14, 18, 20 n.13, 28.

EPIC argues that, "[i]n view of the facts alleged " in its complaint, it is "highly likely—or, at a minimum, highly plausible—that the Government has failed to disclose numerous DAC records subject to disclosure under § 10(b) " of FACA. Pl.'s Mem. 18. EPIC misunderstands the "plausibility standard " of federal pleading rules. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.' " *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. " *Id.* On the other hand, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to] … 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Here, EPIC's complaint does not plead factual content that would allow the court to conclude that defendants improperly withheld records of the DAC or its subgroups.

Specifically with respect to records of the DAC itself (parent committee to the DAC subgroups), EPIC's complaint fails to identify a single DAC document that defendants declined to make available to the public in contradiction of FACA. To the contrary, EPIC's complaint pleads numerous, credible allegations that defendants complied with FACA by disclosing all types of DAC documents. The complaint alleges: (a) that the DAC held "meetings that [were] open to the public, " Compl. ¶ 45; *see also id.* ¶¶ 54, 62, 68, 74, 85, 92; (b) that DAC meetings "were

announced in the Federal Register at least 15 days before each meeting, " *id.* ¶ 44[1];
(c) that DAC "meeting summaries and related information " were made "available
to the public via RTCA's website, " *id.* ¶ 48; (d) that "minutes " of the DAC
meetings were disclosed to the public, *id.* at 9 nn.21–24, (e) that the publicly-
disclosed DAC records included "reports " from the DAC subcommittees, *id.* ¶ 32;
and (f) that the Task Groups "delivered substantive recommendations and reports,
" "report[ed] " on their "progress, " and "presented an interim report " at open-to-
the-public DAC meetings, *e.g.*, *id.* ¶¶ 63, 40. Additionally, notices published in the
Federal Register confirm that agendas for each of the DAC meeting were released to
the public in advance of each DAC meeting. *See* 81 Fed. Reg. 60,402 (Sept. 1, 2016);
82 Fed. Reg. 3,071 (Jan. 10, 2017); 82 Fed. Reg. 18,682 (Apr. 20, 2017); 82 Fed. Reg.
28,929 (June 26, 2017); 82 Fed. Reg. 47,072 (Oct. 10, 2017); 83 Fed. Reg. 7284 (Feb.
20, 2018). Exhibits attached to EPIC's complaint further establish that numerous
records of the DAC—including membership lists, meeting minutes, presentations,
reports, and other documents—were made available to the public via RTCA's
website. *See, e.g.*, Compl. Ex. 1 at 2; Compl. Ex. 3 at 2; Compl. Ex. 5 at 1 (listing
attachments to publicly-posted meeting minutes). Such publicly-disclosed DAC
documents included presentations by the DAC subgroups, which the subgroups
prepared for and delivered to the DAC, and which defendants publicly disclosed.
*See, e.g.*, Compl. Ex. 5 at __; Defs.' Ex. 2 at 2, 37–58, 59–66, 68–72. Taken together,
these factual allegations readily support the legal conclusion that defendants fully
complied with FACA's disclosure requirements with respect to DAC documents.

---

[1] *See also* Federal Register notices published in advance of DAC meetings, 81 Fed.
Reg. 60,402 (Sept. 1, 2016); 82 Fed. Reg. 3,071 (Jan. 10, 2017); 82 Fed. Reg. 18,682
(Apr. 20, 2017); 82 Fed. Reg. 28,929 (June 26, 2017); 82 Fed. Reg. 47,072 (Oct. 10,
2017); 83 Fed. Reg. 7284 (Feb. 20, 2018).

In its opposition brief, rather than highlighting *facts* set forth in its complaint, EPIC points to three conclusory statements within its complaint by which EPIC purports to "allege[] that the Government has failed to disclose DAC records *generally*. " Pl.'s Mem. 16 (emphasis added). These statements convey:

> (1) that EPIC "specifically challenges . . . Defendants' failure to make 'available for public inspection and copying' the 'records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents' of the DAC,' " *id.* (quoting Compl. ¶ 3, which in turn quotes FACA, 5 U.S.C. app. 2 § 10(b));
>
> (2) that the "vast majority of DAC records and subcommittee meetings remain closed to the public in violation of the FACA, " *id.* (quoting Compl. ¶ 23); and
>
> (3) that "Defendants have failed to make 'available for public inspection and copying' numerous 'records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by' the DAC, including but not limited to records arising out of the DACSC and DAC Task Groups, " *id.* (quoting Compl. ¶¶ 119, 125, 132, which in turn quote FACA 5 U.S.C. app. 2 § 10(b)).

"These bare assertions, much like the pleading of conspiracy in *Twombly*, " *Iqbal*, 556 U.S. at 681, and the pleading of a constitutional discrimination claim in *Iqbal*, see id. at 680–81, "amount to nothing more than a "formulaic recitation of the elements " of the FACA disclosure provision. Indeed, the statements EPIC highlights largely quote the FACA statute. Such general, conclusory statements are not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 680–81. The Court should decline to credit "these bald allegations " not "on the ground that they are unrealistic or nonsensical, " but rather because of their "conclusory nature. " *See id.* at 681.

Nor does EPIC's identification of potentially undisclosed documents based on a handful of references, within the exhibits to its complaint, mentioning those

documents, provide a basis for finding that EPIC has stated a plausible claim that defendants improperly failed to disclose DAC documents in violation of FACA. EPIC asserts that the references it cites describe "multiple documents from the DAC parent committee that have never been made public, " including: "an online 'workspace' made available to all DAC members, " "a legal fact sheet, " an "SC-228 briefing " (and/or "webinar "), "notes and data … posted to the Workspace for members to review, " and "minutes " from certain "listening sessions " "attended " by "members of the DAC parent committee. " Pl.'s Mem. 16–17 (citing Compl. Ex. 1 at 6; Compl. Ex. 5 at 4, 10, and 13; Compl. Ex. 10 at 17; Compl. Ex. 11 at 5; Compl. Ex. 12 at 9 and 17). The cited complaint exhibits do not explicitly state, however, that the invoked documents were withheld from public disclosure. *See* Compl. Ex. 1 at 6; Compl. Ex. 5 at 4, 10, and 13; Compl. Ex. 10 at 17; Compl. Ex. 11 at 5; Compl. Ex. 12 at 9 and 17. Rather, EPIC appears to assume that the documents mentioned in the exhibits were never publicly disclosed. *See* Pl.'s Mem. 16–17. The documents EPIC identifies include at least one, and maybe more, documents that actually have been publicly released.[2] But even if taken at EPIC's word that these documents

---

[2] EPIC points to a "legal fact sheet" mentioned in the minutes of the DAC's January 31, 2017 public meeting, Compl. Ex. 5. Pl.'s Opp. 17. The cited exhibit states: "The FAA has issued a legal fact sheet that provides regional contacts when questions arise. FAA will make that fact sheet available to RTCA to post on the DAC and the DACSC Workspace website." *Id.* (quoting Compl. Ex. 5 at 4). The discussion that precedes this statement was about state and local governments' concerns and challenges.  Compl. Ex. 5 at 3-4.  EPIC asserts that "[t]his fact sheet has not been publicly released." *Id.* But a quick Google search for "legal fact sheet faa uas regional contacts" reveals that the FAA's public website includes a December 2015 press release entitled "FAA Issues Fact Sheet on State and Local UAS Laws." *See* https://www.faa.gov/news/updates/?newsId=84369. ("UAS" stands for "unmanned aircraft systems," which EPIC refers to as "drones.") The press release includes a link to the fact sheet itself. *See id.*; *see also* https://www.faa.gov/uas/resources/ uas_regulations_policy/media/uas_fact_sheet_final.pdf. That fact sheet, titled "State and Local Regulation of Unmanned Aircraft Systems (UAS) Fact Sheet," includes regional FAA contacts, and appears on its face to be the same fact sheet described by EPIC. This court may take judicial notice of the press release and the fact that the fact sheet has been released on the FAA's public website. *See, e.g.*, Pharm. Research & Mfrs. of Am. v. U.S. Dep*'t of Health & Human Servs.*, 43 F.Supp.3d 28,

were not released, it would be entirely consistent with FACA and its implementing regulations for defendants to decline to release these documents.

Augmenting FACA, 5 U.S.C.A. App. 2 §§ 10 and 11, Subpart D of the FACA regulations covers  "Advisory Committee Meeting and Recordkeeping Procedures, " and includes subsections on how an interested party obtains access to advisory committee records (§ 102–3.170), and the reporting and recordkeeping requirements

---

33 (D.D.C. 2014); *see also* Fed. R. Evid. 201(d) (providing that "a court may take judicial notice at any stage of the proceeding").

EPIC highlights also an "SC-228 briefing," which was referenced as an "action item" in the January 31, 2017 DAC meeting minutes, and later described in the May 3, 2017 DAC meeting minutes as being something that would be provided by RTCA via webinar available for DAC members to review. *See* Pl.'s Opp. 17 (citing Compl. Ex. 5 at 10 and 13, and Compl. Ex. 10 at 17); *see also* Compl. Ex. 10 at 17 (describing webinar). Viewed in context of other references to "SC-228" within the complaint's exhibits, and publicly known information, it appears that the "SC-228 briefing" was a background, preparatory, informational briefing provided by RTCA to interested DAC members to provide situational awareness and a progress update regarding the work of the separate committee known as "SC-228." The SC-228 committee was a "Special Committee" of the RTCA, which worked to develop "Minimum Operational Performance Standards for Unmanned Aircraft Systems." *See, e.g.*, FAA Order 1110.77V, Charter for RTCA, Inc., Defs.' Ex. 1 at 8. Contemporaneous May 2017 records and documents of the SC-228 Special Committee were publicly disclosed via RTCA's website. *See, e.g.*, https://www.rtca.org/sites/default/files/pmc_may_2017_summary.pdf (summarizing work of the SC-228 Special Committee at that time, and describing final draft documents prepared by SC-228 and published by RTCA); *see also* https://www.rtca.org/content/sc-228 (landing page for SC-228 committee-related documents). According to the exhibit cited by EPIC, RTCA planned in May 2017 "to coordinate a webinar for SC-228 that can be reviewed by all DAC members." Compl. Ex. 10 at 17. Based on this description, the webinar briefing is best understood as something that was provided to interested DAC members for informational purposes. Thus, the webinar appears to have constituted a "[m]eeting[] of two or more [DAC] advisory committee or subcommittee members convened solely to *gather information*," 41 C.F.R. § 102-3.160(a) (emphasis added), which defendants were not required to disclose, *see id.* Additionally, comparing the references in the complaint's exhibits to the publicly released information regarding SC-228, one could just as easily infer (a) that the briefing materials consisted of publicly disclosed information, as (b) EPIC's suggestion that the materials were never publicly disclosed. Such allegation does not "'show[] … that the pleader is entitled to relief.'" *See Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

for an advisory committee (§ 102–3.175). Section 102-3.160 provides that "preparatory work " of federal advisory committees "are excluded from the procedural requirements "—including disclosure requirements—of Subpart D. 41 C.F.R. § 102-3.160. The regulation defines "preparatory work " as:

> Meetings of two or more advisory committee or subcommittee members convened solely to gather information, conduct research, or analyze relevant issues and facts in preparation for a meeting of the advisory committee, or to draft position papers for deliberation by the advisory committee.

*Id.* § 102-3.160(a). The regulation similarly excludes "administrative work " from the disclosure requirements. *See id.* § 102-3.160(b). Contrary to EPIC's erroneous assertion that § 102-3.160 "[b]y its plain terms " does not apply to "records disclosure, " *see* Pl.'s Op. 28, the provision explicitly states that it "[t]he following activities of an advisory committee are excluded from the procedural requirements contained in this subpart, " i.e., subpart D, which includes records disclosure requirements. *Id.*

EPIC complains in its opposition that defendants have failed to publicly disclose such items as minutes of "a series of meetings organized by Task Group 3 " and "described as 'listening sessions,' " which were attended by "members of the DAC parent committee. " Pl.'s Opp. 17 (citing Compl. Ex. 12 at 17, Compl. Ex. 11 at 5). But based on EPIC's allegations, one can only conclude that such meetings fall squarely within the terms of § 102-3.160(a). These were "[m]eetings of two or more advisory committee … members convened solely to gather information, … [and/]or analyze relevant issues and facts in preparation for a meeting of the advisory committee. " *See* 41 C.F.R. § 102-3.160(a).

EPIC's opposition brief also highlights an "online 'workspace' made available to all DAC members. " Pl.'s Opp. 16. EPIC indicates that the "workspace " facilitated work conducted by members of the DAC in between the public DAC

meetings. See id. (quoting Compl. Ex. 1 at 6) ( "Content of the DAC workspace will include calendar, roster, documents created by the DAC, documents under review, background materials for meetings, meeting minutes among other things. Workspace will also be used to facilitate document review and commenting in the final stages of the consensus process. ") EPIC does not point to any specific document within the workspace that it believes was improperly withheld from the publicly-disclosed DAC records. EPIC's exhibits and the publicly available information separately demonstrate that at least some of the materials EPIC alleges were posted to the workspace—including "roster[s], "documents created by the DAC, " "background materials for meetings, " and DAC "meeting minutes "— have been publicly disclosed. *See, e.g.*, Compl. Ex. 5 (publicly disclosed meeting minutes); id. at 1 (listing publicly-disclosed attachments, including background materials for the meeting and presentation slides); Defs.' Ex. 2 at, 37–58, 59–66, 68–72. As for other documents posted to the workspace, EPIC has provided insufficient factual allegations to conclude that any such documents consist of anything other than "preparatory " and/or "administrative work. " *See* 41 C.F.R. § 102-3.160. According to EPIC, the workspace itself facilitated the preparatory work of DAC members. *See* Pl.'s Op. 16. It operated as a space for members of the DAC to "convene[] solely to gather information, conduct research, or analyze relevant issues and facts in preparation for a meeting of the advisory committee, or to draft position papers for deliberation by the advisory committee. " *See id.* § 102-3.160(a). Defendants were not required to publicly disclose the workspace nor the entirety of its contents. *See id.*

EPIC incorrectly asserts that all records of the DAC subgroups were necessarily also records of the DAC itself and thus required to be disclosed under FACA as DAC documents. *See* Pl.'s Opp. 18–21. In support of this argument, EPIC cites *Metcalf. Id.* at 18 (citing *Metcalf v. National Petroleum Council*, 553 F.2d 176,

178 n.13 (D.C. Cir. 1977)). But *Metcalf* does not stand for the proposition advanced by EPIC that all records of a subgroup are necessarily records of the parent advisory committee. *Metcalf* expressly declined to "decide if the NPC [National Petroleum Council] subgroups are advisory committees within the meaning of FACA. "[3] 553 F.2d at 178 n.13. Holding that plaintiffs lacked standing to enforce FACA's requirements through litigation, *Metcalf* did not reach the question of what records of the National Petroleum Council advisory committee or its subgroups needed to be disclosed under FACA. *See id.* at 177, 190–91.

Here again, EPIC fails to consider the import of FACA's implementing regulations. It makes no sense that the regulations would expressly exclude subcommittee records from FACA's disclosure requirements if all subcommittee records were necessarily also records of the parent committee. The FACA regulations plainly exclude subcommittee records from FACA's disclosure requirements, as demonstrated in defendants' opening brief. *See* 41 C.F.R. § 102-3.35(a) (the requirements of FACA do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency); *id*. § 102-3.145 (a subcommittee is subject to the procedural requirements of FACA only if "a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee. "); Defs.' Mem. 4–5, 24-25. Nor does it make sense that the FACA statute would provide for "any subcommittee or other subgroup " of an advisory committee to separately qualify as "an advisory committee " if every subcommittee and subgroup were automatically considered *in toto parentis. See* 5 U.S.C. § 3(2).

---

[3] "[F]or purposes of ruling on the standing issue" in the case, the *Metcalf* court instead chose to "assume that appellants' contentions regarding the subgroups [were] correct." *Id.*

Nowhere does EPIC credibly allege that the DAC subgroups reported *directly* to an FAA officer or agency. On the other hand, EPIC's complaint contains numerous allegations that the DAC subgroups reported to the FAA through the DAC. *See* Defs.' Mem. 8–11 (providing citations to such allegations within the complaint and its exhibits); *see also id.* at 11 (displaying chart, copied from Compl. Ex. 6 at 2, showing that the subgroups reported up through the DAC). Plaintiff's opposition brief does as well. Pl.'s Opp. 6-7 (noting that the DAC subgroups delivered progress reports to the DAC at various meetings). Contrary to EPIC's suggestion, *id.* at 17, the fact that the FAA's Designated Federal Officer (DFO) "approve[d] or call[ed] " gatherings of the DAC subgroups does not transform all work conducted by the DAC subgroups into DAC advisory committee work. The FACA regulations in fact require DFOs to both "approve " and "call " the meetings of advisory committees *and* their subcommittees, 41 C.F.R. § 102-3.120, but still only subject subcommittees to FACA's disclosure provisions if they report directly to the agency and bypass the parent committee in the ways identified by § 102-3.145.

Rather than acknowledging the direct applicability of the FACA regulations, EPIC relies on irrelevant records schedules requiring agencies to preserve records under the Federal Records Act, which is of course different from disclosing them to the public pursuant to FACA. Pl.'s Opp. 19. Nor does a GSA training slide have the force of law sufficient to contradict its regulations. *Contra id.* (citing Comp. Ex. 16 at 2). And EPIC's attempt to analogize this case to the Freedom of Information Act, *id.* at 20, again ignores the very specific FACA regulations on the subject, and fails for that reason.

## B. The Drone Advisory Committee subgroups were not advisory committees in their own right.

EPIC next argues that the DAC subgroup records must be disclosed because the DAC subgroups qualify on their own as "advisory committees. " Pl.'s Opp. 21–

11

27. FACA § 3(2) provides that a "subcommittee or other subgroup " of an advisory committee can itself be considered an "advisory committee " if, and only if, (1) the subcommittee or subgroup is "established by statute or reorganization plan " or "established or utilized " by the President or one or more agencies, (2) the group is created "in the interest of obtaining advice or recommendations *for* the President or one or more agencies or officers of the Federal Government. " 5 U.S.C. app. 2 § 3(2) (emphasis added); *see also Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 557 F. Supp. 524, 529-30 (D.D.C.), aff'd, 711 F.2d 1071 (D.C. Cir. 1983). EPIC's opposition brief largely ignores the second of these two elements. *See* Pl.'s Opp. 21–28. In reply, defendants start with this second element, as it is fatal to EPIC's bald assertion that the DAC subgroups themselves served as "advisory committees " to the FAA.

1. **EPIC's factual allegations make clear that the Drone Advisory Committee's subgroups did not provide "advice or recommendations " directly to the FAA; instead, they provided "advice or recommendations " to the Drone Advisory Committee.**

For a subgroup to qualify on its own as a federal advisory committee, it is not sufficient that a federal agency may have "established or utilized " the subgroup, or that the subgroup was created by a "quasi-public " entity, *contra* Pl.'s Opp. 21–28; the federal agency must have formed the subgroup for the purpose of "obtaining advice or recommendations " from the subgroup. 5 U.S.C. app. 2 § 3(2). A subgroup that advises a parent advisory committee like the DAC—rather than directly advising a federal agency—does not meet this definition. *See id.* The FACA regulations, which EPIC wholesale ignores, reinforce this principle. 441 C.F.R. § 102-3.35(a) ( "[T]he requirements of the Act . . . do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency[,] "); *id.* § 102-3.145 (a subcommittee is subject to the

procedural requirements of FACA only if "a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee. ").

EPIC's complaint fails to advance any allegation that the DAC subgroups provided advice directly to the FAA, or that the recommendations of the subgorups were adopted by the DAC without further deliberations. Indeed, the complaint's exhibits themselves say that "[n]o recommendations … flow[ed] directly " from the DAC subgroups to the FAA. Compl. Ex. 6 at 3; *see also, e.g.*, *id.* (explaining that any recommendations developed by the DAC subgroups were "vetted in a public DAC meeting, " and only provided to the FAA if approved by the DAC); Ex. 6 at 2 (containing chart showing relationship between the FAA, the DAC, and its subgroups). The DAC subgroups advised the DAC and the DAC advised the FAA, as EPIC's opposition brief itself argues. *See* Pl.'s Opp. 28–29 (discussing policy recommendations developed by the DAC subgroups and presented to the DAC at public meetings); see also Compl. Ex. 6 at 2.

EPIC's opposition criticizes defendants for relying on the district court's decision in *National Anti-Hunger Coalition*.[4] *See* Pl.'s Opp. 29; *see also* Defs.' Mem. 24–25, 26 (discussing *Nat. Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 557 F. Supp. 524, 529 (D.D.C.), *aff'd*, 711 F.2d 1071 (D.C. Cir. 1983)). EPIC characterizes the district court's decision as "non-binding. " Pl.'s Opp. 29. That may be technically true, but the decision certainly provides persuasive authority. This is particularly so because on appeal the D.C. Circuit

---

[4] Without explanation, EPIC portrays the *Anti-Hunger* holding as "dicta." *See* Pl.'s Opp. 29. It was not. *See Anti-Hunger*, 557 F. Supp. at 529 (holding that the "task forces" in that case were not "advisory committees" under FACA because they "d[id] not directly advise the President or any federal agency, but rather provide[d] information and recommendations for consideration to the [parent] Committee").

expressly "approve[d] the reasoning under which the District Court rejected … [plaintiff's] contention[] " that the subgroups "[were] themselves advisory committees whose structure and procedures contravene[d] various provisions of the Act. " *Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1072 (D.C. Cir. 1983).[5] Moreover, the district court's reasoning and ultimate holding in *Anti-Hunger*—that FACA's requirements do not apply to a subgroup that provided information and recommendations for consideration to a parent committee but did not directly advise the President or any federal agency—square with FACA's statutory text and the implementing regulations. *See Anti-Hunger*, 557 F. Supp. at 529; *see also* 5 U.S.C. app. 2 § 3(2); 41 C.F.R. §§ 102-3.25, 102-3.35, 102-3.70(c), 102-3.75(b), 102-3.145, and 102-3.160.

## 2. EPIC's factual allegations convey that the Drone Advisory Committee—not the FAA— "established or utilized " the DAC subgroups.

EPIC's arguments that the FAA "established " or "utilized " the DAC subgroups misread and ignore applicable law.

### *Established "*

In arguing that the FAA "established " the DAC subgroups, EPIC appears to rely on the common-sense meaning of the word "established, " *see id.*, rather than the statutory meaning of that term. *See, e.g.*, *Byrd v. EPA*, 174 F.3d 239, 245-46

---

[5] Quoting *dicta* from a later D.C. Circuit decision, *Association of American Physicians & Surgeons, Inc.* (*AAPS*)*,* EPIC contends that the Court of Appeals in *Anti-Hunger* "'did not explicitly approve the [district] judge's reasoning relating to the supposed staff groups.'" Pl.'s Opp. 29 n.2 (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 912 (D.C. Cir. 1993)). *AAPS's* statement constitutes *dicta* because the *AAPS* court's holding did not rely on it. *See* AAPS, 997 F.2d at 912. Moreover, in making this observation, *AAPS* referenced only 711 F.2d at 1075, and not the earlier page of the D.C. Circuit's *Anti-Hunger* decision that expressly "approve[d] the reasoning … [of] the District Court" on the issue of whether the task forces themselves were advisory committees. *See AAPS*, 997 F.2d at 912; *see also Anti-Hunger*, 711 F.2d at 1072.

(D.C. Cir. 1999) (listing cases interpreting "established " in FACA § 3(2) as differing from its common meaning of that word); *Judicial Watch, Inc. v. Department of Commerce*, 501 F.Supp.2d 83, 88 (D.D.C. 2007). For example, EPIC quotes the following sentence from the DACSC Terms of Reference, adding emphasis to the word "establish " as it appears within the sentence: "'FAA seeks to *establish* a venue and process to enable stakeholders to advise the FAA on the needs of these new and expanding users of the National Airspace System . . . .' "[6] Pl. Opp. at 22 (quoting Compl. Ex. 6 at 117) (emphasis in EPIC's brief). EPIC insists too that the FAA "issued " "Terms of Reference " and "Tasking Statements, " and that those documents "constitute the foundational document[s] " of the subgroups. Pl.'s Opp. 23.

That the FAA played a role in the creation of the DAC subgroups does not mean that the FAA "established " those groups in the statutory sense of the word. An agency "establishes " an advisory committee when the agency "actually " and "directly " forms it. *See, e.g.*, *Byrd v. EPA*, 174 F.3d 239, 245 (D.C. Cir. 1999); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F.Supp.2d 24, 32 (D.D.C. 2010). As noted in defendants' opening brief, EPIC's complaint does not contain a factual allegation supporting the notion that the FAA—as opposed to the DAC and its members—directly or actually formed the DAC subgroups. *See* Defs.' Mem. 23 (

---

[6] Viewed in context, however, this sentence does not appear to be referring to the DACSC as the entity that the FAA was "establish[ing]." Rather, it invokes the DAC and the overall mechanism of the DAC advisory committee, which included the DAC's use of DAC-formed subgroups. Though the sentence appears in the two-paragraph "Background" section of the DACSC Terms of Reference quoted by EPIC, the sentence and entire section in which it appears were copied from the "Background" section of the DAC Terms of Reference. *Compare* Compl. Ex. 6 at 117, *with* Compl. Ex. 1 at 1. The carrying over of this "Background" from the DAC Terms of Reference, along with the phrasing of the sentence itself, indicates that the "venue" and "process" referenced are that of the DAC, not its subgroup the DACSC. The sentence does not support a conclusion that the FAA "established" the DAC subgroups as that term has been understood by the courts.

"[T]he complaint merely states that each one "was established, " without alleging who did the establishing. "); *see also* Compl. ¶¶ 30, 35, 36, 37. EPIC's opposition brief does not directly counter this point, but instead tries to obscure the issue by pointing to various allegations that the FAA played some role in conceiving of the subgroups. *See* Pl.'s Opp. 22–23.

The opposition brief highlights EPIC's allegation that prior to the first meeting of the DAC, the FAA contemplated that the DAC would utilize subgroups.[7] Pl.'s Mem. 22 (citing FAA press release issued prior to first DAC meeting). The brief notes also that then-DFO Wassmer stated that the FAA had "'issued' " the DACSC Terms of Reference.[8] *Id.* (quoting Compl. Ex. 10 at 4). EPIC emphasizes that the "Terms of Reference exhaustively laid out the purpose, structure, operating guidelines, membership breakdown, meeting procedures, and deliverables for the DACSC. " *Id.* (citing Compl. Ex. 6 at 117–21). But the document entitled "DACSC Terms of Reference " to which EPIC refers does not on its face appear to have been authored or issued by the FAA; rather the document appears on RTCA letterhead with the identification "RTCA Paper Number: 290-16/DACSC-02. " Compl. Ex. 6 at 1. It lists DAC members—not FAA officials—as the relevant DACSC "Subcommittee Leadership. " Compl. Ex. 6 at 1. Elsewhere too the complaint's exhibits reveal that—while the FAA may have recommended their creation—it was

---

[7] EPIC goes further by stating that, via this press release, the "FAA announced the formation of the DACSC and DAC Task Groups." Pl.'s Opp. 22. But the exhibit does not support EPIC's reading. The press release conveys the FAA's anticipation that the DAC advisory committee would use subgroups; it does not "announce[]" that the specific subgroups had been formed. *Compare* Compl. Ex. 3 at 2, *with* Pl.'s Opp. 22.

[8] More precisely, —according to minutes of the May 3, 2017 DAC public meeting— then-DFO Wassmer, reading from a slide presentation, told the DAC about "… the dates of when the FAA has issued the terms of reference for the DAC, DACSC, and TGs as well as the dates of the meeting." Compl. Ex. 10 at 4.

the DAC, not the FAA, that actually established the DAC subgroups. *See, e.g.*, Compl. Ex. 4 at 4, 7, 8, 18; *see also* Defs.' Mem. 23.

### *"Utilized "*

"The word 'utilized' . . . is a stringent standard, denoting something along the lines of actual management or control of the advisory committee. " *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1450 (D.C. Cir. 1994). EPIC's opposition brief nominally articulates the correct standard here, *see* Pl.'s Opp. 24. but it fails to apply the standard in a manner consistent with the FACA scheme and relevant caselaw.

Essentially, EPIC faults the FAA for complying with the FACA regulations' guidance regarding use of advisory committee subcommittees, asserting that the various contacts the FAA had with the subgroups—all of which were not only consistent with, but indeed required by the FACA regulations—indicate that the FAA conducted "actual management or control " of the DAC subgroups. For example, EPIC emphasizes the fact that the FAA "approved " the Task Groups, Pl.'s Op. 4, even though 41 C.F.R. § 102-3.35(b) requires "the agency establishing the parent advisory committee " to "approve " "[t]he creation and operation of subcommittees. " EPIC stresses the involvement of the FAA's DFO in the activity of the DAC subgroups. Pl.'s Op. 24 (highlighting the fact that FAA's DFO or alternate "call[ed], attend[ed], and adjourn[ed] all the committee/ subcommittee meetings'; 'approve[d] all committee/subcommittee agendas'; and 'chair[ed] meetings when directed to do so by the FAA Administrator' "). But, again, the FACA regulations explicitly required such involvement. *See* 41 C.F.R. § 102-3.120.

In addition, EPIC's opposition brief wholly ignores caselaw applying the "management or control " standard for finding that a group was "utilized " as an advisory committee by a federal agency. None of the facts highlighted by EPIC

allow the Court to infer that the FAA actually managed or controlled, and thus "utilized " the DAC subgroups. *See, e.g.*, *Center for Arms Control and Non-Proliferation v. Pray*, 531 F.3d 836, 840 (D.C. Cir. 2008) ( "'[P]articipation by an agency or even an agency's significant influence over a committee's deliberations does not qualify as management and control such that the committee is utilized by the agency under FACA' ") (quoting *Byrd v. EPA*, 174 F.3d 239, 245–48 (1999)); *see also* Defs.' Mem. 24–25.

### 3.   EPIC's "quasi-public " theory fails.

EPIC argues that "even if … the DAC, not the FAA, actually established the DAC subgroups … the subgroups would still qualify as advisory committees under the 'quasi-public' rule. " Pl.'s Opp. 26 (internal quotation omitted). EPIC errs by taking a set of characteristics used by the D.C. Circuit in *Animal Legal Defense Fund* to describe the National Academy of Sciences, and elevating those characteristics to a so-called "rule " that EPIC insists provides an alternative basis—in addition to "established or utilized "—by which the DAC subgroups may be considered "advisory committees " under FACA § 3(2). *Id.* (quoting *Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d 424, 429 (D.C. Cir. 1997)). According to this "rule " as announced by EPIC, it does not matter whether the DAC subgroups were "formed for the explicit purpose of furnishing advice to the government, " so long as the "organization that created " them—here, the DAC—meets the following three-part test: "(1) [the organization] was quasi-public rather than 'purely private'; (2) [the organization] was 'formed and funded' by the Government; and (3) [the organization] was 'formed for the explicit purpose of furnishing advice to the Government.' " *Id.* (quoting *Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d 424, 429 (D.C. Cir. 1997). But *Animal Legal Defense Fund* did not purport to articulate such a test or to recognize a "'quasi-public' rule. " *See* Pl.'s Opp. 26; *Animal Legal*

*Def. Fund, Inc.*, 104 F.3d at 428–30; *see also id.* at 429 ( "[Q]uasi-public does not have an independent meaning divorced from the [Supreme] Court's reference in *Public Citizen.* ").

The concept of a "quasi-public " entity in a FACA case stems from the Supreme Court's opinion in *Public Citizen.* In explaining the distinction between "established " and "utilized, " the Court observed:

> The words "or utilized " were added by the Conference Committee to the definition [of an advisory committee] included in the House bill. … In the section dealing with FACA's range of application, the Conference Report stated: "The Act does not apply to persons or organizations which have contractual relationships with Federal agencies nor to advisory committees not directly established by or for such agencies. " … *The phrase "or utilized " therefore appears to have been added simply to clarify that FACA applies to advisory committees established by the Federal Government in a generous sense of that term, encompassing groups formed indirectly by quasi-public organizations such as the National Academy of Sciences "for " public agencies as well as "by " such agencies themselves.*

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 462 (1989). The Court concluded "that by employing the term 'utilized,' in addition to 'established,' Congress had in mind an extension of the Act's coverage to include the offspring of 'quasi-public' organizations 'permeated by the Federal government.' " *Animal Legal Def. Fund, Inc.*, 104 F.3d at 429 (quoting *Pub. Citizen*, 491 U.S. at 460, 463). In other words, the Court used the concept of a "quasi-public entity " to limit the definition of "utilized. " *See id.* (explaining that "the offspring of 'quasi-public' organizations permeated by the Federal government was the only sort of advisory committee the Court recognized as reached by the term 'utilized' "). Although the Supreme Court did not define the term "quasi-public entity, " it identified the National Academy of Sciences as the "paradigmatic example " of such an entity, *Pub. Citizen*, 491 U.S. at 460, explaining that the "National Academy of Sciences was created by Congress as a semi-private organization for the explicit purpose of furnishing advice to the

Government, " *id.* at 460 n.11. S*ee also Animal Legal Def. Fund, Inc.*, 104 F.3d at 429 ( "[Q]uasi-public does not have an independent meaning divorced from the [Supreme] Court's reference in *Public Citizen.* ").

EPIC incorrectly identifies the so-called  "quasi-public " test as providing an additional mechanism by which the DAC subgroups might be found to be  "advisory committees. " Pl.'s Opp. 26. EPIC fails to identify a single case applying this  "test. " As such, EPIC lacks authority for its theory that the DAC constituted a  "quasi-public " organization such that every group created by the DAC would necessarily be considered an  "advisory committee. " Under EPIC's theory, *every* federal advisory committee, having been  "formed and funded by the Government, "  "for the explicit purpose of furnishing advice to the Government, " would be considered a "quasi-public " organization. And every subgroup or subcommittee formed by a ( "quasi-public ") federal advisory committee would thus automatically be deemed an "advisory committee. " This would render anomalous FACA § 3(2) inclusion of  "any subcommittee or other subgroup " within the type of groups that could be considered "advisory committees " *if* they meet the statutory definition. It would also conflict with the FACA regulations, which defines subcommittees separately from "advisory committees " and provide that subcommittees are  "generally not subject to the Act. " 41 C.F.R. § 102-3.25.

### II. The court lacks jurisdiction over the complaint's open meeting claims and the direct Federal Advisory Committee Act and Declaratory Judgment Act claims.

### A.  EPIC lacks particularized injury with respect to its open-meeting claims, and therefore cannot establish standing to pursue those claims.

Defendants have moved to dismiss Counts I, II, and III of the complaint (EPIC's  "open-meeting claims "), for lack of standing pursuant to Rule 12(b)(1) of

the Federal Rules of Civil Procedure. *See* Defs.' Mot. 1; Defs.' Mem. 16–18. EPIC did not seek to attend any meetings of the DAC subgroups. Accordingly, EPIC fails to establish a particularized injury relating to its open-meeting claims.

In response, EPIC argues that it was not required to "seek " to attend the DAC subgroup meetings in order to establish standing. Pl.s' Mem. 32. EPIC offers no explanation as to how it might demonstrate a *particularized* informational-injury other than by seeking to attend meetings and then being denied. Instead, EPIC argues it possesses standing in this case merely because defendants "fail[ed] to open DAC subgroup meetings " and thus "'refus[ed] to disclose information' that FACA requires it to make public. " *Id.* at 33 (quoting *Judicial Watch v. U.S. Dep't of Commerce*, 583 F.3d 871, 873 (D.C. Cir. 2009)). Under EPIC's theory, everyone has standing to sue defendants for failure to hold open meetings of the DAC subgroups. That cannot be. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982) (federal courts are not "ombudsmen of the general welfare "); *Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011) ( "Standing … ensures that a litigant alleges such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction. ") (internal quotation and citation omitted) (emphasis in original).

As defendants explained in their opening brief, a plaintiff attempting to establish standing on an informational-injury theory must make at least a minimum "show[ing] … that they sought and were denied " information. Defs.' Mem. 17 (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989)); *see also Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). EPIC asserts that a FACA plaintiff can establish informational injury even without "seeking and being denied " information, Pl.'s Mem. 32, but it identifies no cases in which a court

21

held a plaintiff suffered an informational injury despite not having first sought the information at issue. *Cf. id.*

EPIC's injury argument relies principally on an out-of-context quotation from *Judicial Watch, Inc. v. U.S. Department of Commerce*, a case regarding the causation and redressability prongs of standing. *See* Pl.'s Mem. 32 (quoting *Judicial Watch,* 583 F.3d 871, 873 (D.C. Cir. 2009), for the proposition that  "[i]n the context of a FACA claim, an agency's refusal to disclose information that the act requires be revealed constitutes a sufficient injury "). *Judicial Watch* does not actually support EPIC's conclusion that a FACA plaintiff need not  "'seek' FACA records [or to attend meetings] in order to establish informational standing. " *Cf.* Pl.'s Mem. 32; *see Judicial Watch*, 583 F.3d at 873. As the district court opinion in that case made clear, the plaintiff in *Judicial Watch* had  "sought access to records regarding [the purported advisory committee at issue] " and had  "submitted a request … to participate in meetings " of the purported advisory committee. *Id.* Based on that record, the Court of Appeals found the injury requirement to have been met. 583 F.3d at 873.

EPIC argues, apparently in the alternative, that it did  "seek " to attend the meetings of the DAC subgroups when, on March 20, 2017, it sent its records request to the FAA. Pl.'s Opp. 18; see also Compl. Ex. 18 at 1 (EPIC's  "records request). This makes no sense. The records request says nothing about wanting to attend meetings. Compl. Ex. 18 at 1. And it was submitted after all the meetings of the DAC, as it was then constituted, and its subgroups had concluded; the final meeting of the DAC occurred on March 9, 2018. See Compl. ¶ 92; see also Defs.' Mem. 11–12 (discussing lapse of the DAC's charter, and the establishment of a new Drone Advisory Committee referred to in defendants' briefing as New DAC)). This letter does not establish that EPIC sought to attend any meeting of the DAC subgroups in advance of those meetings.

**B.    EPIC cannot pursue direct claims under the Federal Advisory Committee Act or the Declaratory Judgment Act; nor does it properly name the RTCA and DAC advisory committees as defendants.**

Neither the Federal Advisory Committee Act (FACA) nor the Declaratory Judgment Act provide a private right of action. Thus, the claims EPIC purports to bring pursuant to these statutes must be dismissed for lack of subject matter jurisdiction. *See* Defs.' Mem. 18–20.

EPIC argues that the D.C. Circuit has "consistently held " that FACA includes a direct cause of action. Pl.'s Mem. 34. But nearly all of the cases EPIC references in support of this argument were decided prior to the Supreme Court's decision in *Sandoval. See id.* (citing cases that pre-date *Alexander v. Sandoval*, 532 U.S. 275 (2001)). As defendants noted in their opening brief, courts prior to *Sandoval* sometimes assumed without elaboration that FACA provides a cause of action, *see* Defs.' Mem. 19 n.12, but following *Sandoval*, courts in the D.C. Circuit have consistently held that "FACA does not provide a cause of action, given that none is apparent from the statutory text, "*Ctr. for Biological Diversity*, 239 F. Supp. 3d at 221; *see also* Defs.' Mem. 19. EPIC's opposition brief cites only one post-*Sandoval* case: *National Resources Defense Council*. Pl.'s Mem. 33–34. In *National Resources Defense Council*, the Court of Appeals reversed the district court's dismissal of a claim that the Court of Appeals referred to as the plaintiff's "FACA claim. " *See Nat. Res. Def. Council v. Johnson*, 488 F.3d 1002, 1002–03 (D.C. Cir. 2007) (*per curiam*); *see also id.* ( "One of [plaintiff's] claims was that the Agency had not complied with the Federal Advisory Committee Act (FACA). "). The Court of Appeals did not consider the issue of whether FACA provides a direct cause of action. See *id.* Moreover, the plaintiff's complaint in that case reveals that plaintiff's "FACA claim " did not rely on FACA for its cause of action, but instead relied on the Administrative Procedure Act as the cause of action. *See* Compl. for Declaratory and

Injunctive Relief at 24, *Nat. Res. Def. Council v. Johnson*, No. 05-cv-340 (D.D.C.) (Dkt. # 1).

EPIC's opposition brief cites no authority for its argument that the Declaratory Judgment Act provides a private right of action. In reply, defendants refer the Court to their opening brief. Defs.' Mem. 18, 19–20.

In arguing that it properly named the Drone Advisory Committee and the RTCA Advisory Committee as defendants, EPIC offers no rebuttal to defendants' argument that any arguments against the DAC (as then constituted) and the RTCA Advisory Committee are moot because those entities no longer exist. *Compare* Pl.'s Opp. 34–36, *with* Defs.' Mem. 28. EPIC admits that its "entitlement to relief does not depend on the continued presence of the Drone Advisory Committee as a party to this suit, "Pl.'s Opp. 35, suggesting that any harm alleged by EPIC could not be redressed by the DAC and thus EPIC lacks standing to sue the DAC in any event. *See id.* Finally, "EPIC does not object "to the dismissal of claims against the RTCA Advisory Committee. Pl.'s Opp. 35.

## Conclusion

For the reasons discussed above and in defendants' opening brief, the court should dismiss EPIC's complaint in its entirety.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director
Civil Division

*/s/ Lisa Zeidner Marcus*
LISA ZEIDNER MARCUS
Senior Counsel (N.Y. Bar # 4461679)

24

U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Avenue NW, 7th Floor
Washington, DC 20530
Tel: (202) 514-3336
Fax: (202) 616-8470
Email: lisa.marcus@usdoj.gov

*Attorneys for Defendants*