# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | : | | |
| | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-833 (RC) |
| | : | | |
| v. | : | Re Document No.: | 16 |
| | : | | |
| DRONE ADVISORY COMMITTEE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

This case involves a dispute over the public transparency obligations of the Drone Advisory Committee ("DAC"), an advisory committee created by the Federal Aviation Administration ("FAA") to address the challenges associated with the integration of drones in the National Airspace System ("NAS"). Plaintiff the Electronic Privacy Information Center ("EPIC") has a particular interest in the privacy concerns posed by drones, and has engaged the FAA on that issue on multiple occasions in the past few years. In this case, EPIC alleges that the DAC, its subcommittee (the DAC Subcommittee, or "DACSC"), and three DAC task groups active between 2017 and 2018 violated the public record requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2, by failing to make available records of their activities pursuant to the Act. EPIC also alleges that the DACSC and DAC task groups failed to comply with FACA's open meeting requirements, by engaging in secret meetings closed to the public.

EPIC initially brought claims against the FAA, the Department of Transportation ("DOT"), FAA and DOT officials, the DAC, and the DAC's parent advisory committee, the Radio Technical Commission for Aeronautics ("RTCA") Advisory Committee, under FACA, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a). After EPIC voluntarily dismissed its claims against the RTCA, the remaining Defendants have now moved to dismiss all claims for lack of subject matter jurisdiction or failure to state a claim. For the reasons stated below, the Court finds that it lacks subject matter jurisdiction to consider EPIC's FACA claims, APA open meetings claims, DJA claim, and APA claims against the DAC. The Court also finds that while EPIC's complaint states a cognizable APA claim as to the DAC's alleged failure to comply with its public records obligations, it fails to state a claim as to the public records obligations of the DACSC and the DAC task groups. The Court accordingly grants in part and denies in part the motion to dismiss.

## II. BACKGROUND

### A. Advisory Committee Transparency Obligations Under FACA

Enacted in 1972, the Federal Advisory Committee Act, Pub. L. No. 92–463, 86 Stat. 770 (codified at 5 U.S.C. App. 2), was intended to create more transparency around the multitude of advisory committees working with the executive branch. FACA defines an advisory committee as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof," which, *inter alia*, is "established or utilized by one or more agencies[] in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. App. 2 § 3(2). The Act imposes a number of transparency requirements on advisory committees,

including that advisory committee meetings be open to the public and that advisory committee records be publicly available.

With respect to the open meeting requirement, FACA provides that "[e]ach advisory committee meeting shall be open to the public," *id.* § 10(a)(1), and that "timely notice of each such meeting shall be published in the Federal Register," *id.* § 10(a)(2). And as to committee records, FACA mandates that the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee" be made available for public inspection, subject only to the exceptions provided under the Freedom of Information Act, 5 U.S.C. § 552. 5 U.S.C. App. 2 § 10(b).

### B. Creation of the DAC

Drone availability and use in the United States has steadily increased over the past few years. U.S. drone sales more than doubled between 2016 and 2017, with commercial drones representing a growing share of the drone market. Compl. ¶ 20, ECF No. 1. In response to this rapidly expanding drone use, the FAA announced the formation of the DAC in May 2016. *Id.* ¶ 24. The DAC was set up under the RTCA Advisory Committee, an advisory committee utilized by the FAA and DOT, *id.* ¶ 12, as a "broad based advisory committee that w[ould] provide advice on key unmanned aircraft integration issues," *id.* ¶ 24 (quoting May 2016 FAA Press Release, Compl. Ex. 2, ECF No. 1-2). It held its first public meeting on September 16, 2016. *Id.* ¶ 26.

The FAA issued Terms of Reference to guide the operation of the DAC. *See id.* ¶ 28; DAC Terms of Reference at 1, Compl. Ex. 1. The Terms of Reference identified the DAC as a federal advisory committee subject to FACA reporting requirements, DAC Terms of Reference

at 6, and charged the DAC with "identify[ing] and recommend[ing] a single, consensus-based set of resolutions for issues regarding the efficiency and safety of integrating UAS [unmanned aerial systems] into the NAS and . . . develop[ing] recommendations to address those issues and challenges," Compl. ¶ 28 (quoting DAC Terms of Reference at 2). The Terms of Reference also specified that while the DAC was an "open venue" designed to "ensure transparency" in the discussion of the various issues relating to integrating drones into the NAS, it would be supplemented by task groups "established to develop recommendations and other documents," and by the DACSC, for which only "[s]ome meetings" would be open to the public. DAC Terms of Reference at 1–2. In its press release announcing the DAC's first meeting on September 16, 2016, the FAA explained that the DAC would "conduct more detailed business through a subcommittee and various task groups" that would "help the FAA prioritize its activities." August 31, 2016 FAA Press Release at 2, Compl. Ex. 3.

### C. Operation of the DAC Between 2016 and 2018

The DAC officially met six times between September 2016 and March 2018. *See generally* Compl. ¶¶ 54–92. Each meeting of the DAC was announced in advance and held open to the public. *See generally id.* At DAC meetings, the committee discussed progress made on the various issues identified with drone integration, including work performed by the DACSC and three DAC task groups established to research particular topics identified by the FAA and the DAC.

### 1. September 16, 2016 to January 31, 2017

At the first meeting of the DAC on September 16, 2016, the Committee discussed a number of administrative matters, including regulatory issues and procedures it would follow going forward. *See generally* Sept. 16, 2016 DAC Meeting Minutes, Compl. Ex. 4. The DAC

identified several action items at the end of the meeting, including to "[e]stablish a standing DAC Subcommittee (DACSC) . . . [and] task the DACSC to establish a ranked set of priorities among the remaining drone integration issues the DAC identified at its inaugural meeting," and to "[e]stablish a task group to develop a minimum set of requirements . . . that operators can follow to gain access to airspace."

Following the meeting, the FAA published detailed Terms of Reference for the DACSC on October 28, 2016. DACSC Terms of Reference, Compl. Ex. 6. The DACSC Terms of Reference explained that the DACSC's purpose was to "support the DAC in developing consensus-based recommendations to the FAA on issues related to the integration of UAS into the nation's airspace." *Id.* at 1. The DACSC, composed of subject-matter experts on drone and NAS integration issues, would "provide the staff work for the DAC, applying knowledge and expertise to forge consensus on critical issues and providing input to the DAC for public deliberation and the development of recommendations to be forwarded to the FAA." *Id.*

The DACSC Terms of Reference also identified the DACSC's role in monitoring the activities of the various task groups to be set up by the DAC. The DACSC was to "provide guidance and oversight to the Task Groups," which the Terms of Reference defined as "shorter-lived groups established to forge consensus-based recommendations in response to specific taskings handed down from the DAC." *Id.* at 2. The Terms of Reference identified a clear hierarchical structure, with the FAA issuing taskings to the DAC, which would then hand down task statements to the DACSC, with the DACSC coordinating the work of the DAC task groups. *See id.* The Terms of Reference also stated that the DACSC would "address issues as directed by the DAC," with "[n]o recommendations . . . flow[ing] directly from the DACSC or DAC TGs

[task groups] directly to the FAA" and with all recommendations to be "vetted in a public DAC meeting and transmitted to the FAA upon approval by the DAC." *Id.* at 3.

Between its first meeting on September 16, 2016 and its second meeting on January 31, 2017, the DAC also established its first two task groups, Task Group 1 and Task Group 2. Compl. ¶ 59. Task Group 1 was set up as the "Roles and Responsibilities" task group, charged with evaluating the relative roles and responsibilities of federal, state, and local government actors in regulating drones. *See* January 31, 2017 DAC Meeting Minutes at 3, Compl. Ex. 5. Task Group 2, the "Access to Airspace" task group, was charged with evaluating access to airspace requirements for drones. *See id.* at 5. During that time period, the DACSC, Task Group 1, and Task Group 2 engaged in official committee business, and held meetings that were not publicly noticed or announced to the public. Compl. ¶¶ 60–61.

## 2. January 31, 2017 to May 3, 2017

On January 31, 2017, the DAC held its second official meeting. *Id.* ¶ 62. At the meeting, both the DACSC, Task Group 1, and Task Group 2 delivered progress reports. *Id.* ¶ 63. Task Groups 1 and 2 also presented substantive recommendations to the DAC. *Id.* The recommendations were discussed publicly by the Committee and several changes were suggested to the tasking statements for both task groups, and to the recommendations of Task Group 2. *See* January 31, 2017 DAC Meeting Minutes at 3–7, 12–13. The DAC also discussed the creation of a third task group, Task Group 3 (the "Funding" task group), intended to evaluate the funding and costs associated with the DAC's work over the next twenty-four months. *Id.* at 7–9. The FAA introduced a draft tasking statement that was discussed at the meeting and on which the DAC suggested modifications. *Id.* at 7, 12.

Following the January 31, 2017 meeting, the FAA issued final tasking statements for Task Group 1 and Task Group 2 on February 10, 2017. *See* Task Group 1 Tasking Statement, Compl. Ex. 7; Task Group 2 Tasking Statement, Compl. Ex. 8. Task Group 1 was asked to evaluate the relative role and responsibilities of the federal, state, and local governments in regulating drone operations in low-altitude airspace. Task Group 1 Tasking Statement at 1. The tasking statement suggested particular issues the task group could address, and sets of recommendations the task group could develop in response to its task. *See id.* at 2–3. The FAA asked for "an interim set of recommendations at the May 2017 DAC Meeting, followed by a final report no later than the October 2017 DAC Meeting." *Id.* at 7. Similarly, the Task Group 2 Tasking Statement asked that Task Group 2 "provide recommendations on UAS operations/missions beyond those currently permitted, and define procedures for industry to gain access to the airspace." Task Group 2 Tasking Statement at 1, Compl. Ex. 8. The FAA asked for recommendations on four sets of issues, and, as with Task Group 1, requested an interim set of recommendations by the May 2017 DAC meeting and a final report to be submitted no later than the October 2017 DAC meeting. *Id.* at 2.

On March 7, 2017, the FAA issued its final tasking statement for Task Group 3. The tasking statement asked that the DAC "evaluate and analyze potential mechanisms for UAS users to fund the activities and services required to safely integrate UAS into the NAS over the near term." Task Group 3 Tasking Statement at 1, Compl. Ex. 9. The tasking statement noted that the recommendations would "be used to inform near term government action," *id.*, with a target interim report to be submitted by the task group to the DAC by June 30, 2017 so that a final report incorporating any DAC feedback could be prepared by March 2018, *id.* at 2.

Between the January 31, 2017 and May 3, 2017 meetings of the DAC, both the DACSC and task groups 1, 2, and 3 conducted meetings and engaged in official committee business. Compl. ¶ 65.  None of the meetings were publicly noticed or announced.  *Id.* ¶¶ 66–67

### 3.  May 3, 2017 to April 11, 2018

Between May 3, 2017 and the filing of the Complaint on April 11, 2018, the DAC met another four times.  *Id.* ¶¶ 68–92.  At the May 3, 2017 meeting, all of the three DAC task groups delivered progress reports to the DAC.  *Id.* ¶ 69.  Both task groups 1 and 2 submitted recommendations, for which the DAC provided feedback and suggested changes.  May 3, 2017 DAC Meeting Minutes at 9–14, 17, Compl. Ex. 10.  At the July 21, 2017 meeting, task groups 1 and 3 delivered progress reports to the DAC, with Task Group 3 submitting its interim report on funding mechanisms for the introduction of drones into the NAS.  Compl. ¶ 75.  The DAC approved Task Group 3's interim report and relayed feedback to Task Group 1 to "accommodate . . . more balanced TG membership" by better involving state and local authorities.  July 21, 2017 DAC Meeting Minutes at 8–9, Compl. Ex. 11.  At the November 8, 2017 meeting, the DACSC and all three task groups delivered progress reports, with Task Group 2 presenting a final report regarding access to airspace.  Compl. ¶¶ 85–87.  The minutes for the meeting reflect that there was substantial discussion of each task group's report, and the Task Group 2 final report was approved after a clarifying amendment by the DAC.  Nov. 8, 2017 DAC Meeting Minutes at 8–18, Compl. Ex. 12.  The DAC met again on March 9, 2018.  Compl. ¶ 92.

As with the prior meetings of the DAC, both the DACSC and the three DAC task groups conducted meetings and engaged in official committee business between May 3, 2017 and April 11, 2018.  And while the DACSC and DAC task group reports provided at each public DAC meeting gave some insight into the work conducted by each, the DACSC and DAC task group

meetings remained unannounced and closed to the public during that time. Compl. ¶¶ 71–72, 79–80, 89–90.

### D. Procedural History

On March 20, 2018, EPIC sent the FAA, DOT, DAC, and RTCA a request for all records of the DAC and DAC subcomponents required to be made available to the public under 5 U.S.C. App. 2 § 10(b). *Id.* ¶¶ 95–96. EPIC did not receive any response to its request. *Id.* ¶ 99. On April 11, 2018, the organization filed suit, naming as defendants the FAA, DOT, DAC, and RTCA, as well as FAA Acting Administrator Daniel K. Elwell and DOT Committee Management Officer David W. Freeman, the DOT employee responsible for supervising the DAC and RTCA. *Id.* ¶¶ 11–16. In the Complaint, EPIC brings two claims directly under FACA for violations of the Act's open meeting and public record requirements, four APA claims linked to the alleged violations of FACA, and one claim for declaratory judgment pursuant to the Declaratory Judgment Act. *Id.* ¶¶ 102–139.

On June 25, 2018, EPIC filed a stipulation of dismissal with regards to the RTCA pursuant to Fed. R. Civ. P. 41(a)(1)(A). Pl.'s Stipulation of Dismissal at 1, ECF No. 13. On July 3, 2018, the government filed a motion to dismiss on behalf of all remaining defendants ("Defendants").[1] Defs.' Mot. Dismiss at 1, ECF No. 16. In their motion, Defendants argue that the Court lacks subject matter jurisdiction to address EPIC's FACA claims, APA open meeting claims, DJA claim, and APA claims against the DAC. *See id.* Defendants also argue that the Complaint fails to state a claim as to all remaining claims. *See id.* EPIC filed its opposition on

---

[1] In the motion to dismiss, the government purports to also represent the RTCA and asks for dismissal of all claims against the RTCA. Defs. Mot. Dismiss at 1. However, EPIC having voluntarily dismissed its claims against the RTCA on June 25, 2018, the committee was no longer a defendant at the time of the filing of the motion to dismiss. The Court does not address any arguments made with respect to the RTCA.

July 17, 2018, Pl.'s Mem. Opp'n Mot. Dismiss at 1, ECF No. 18, and the government filed its

reply on July 27, 2018, Defs.' Reply at 1, ECF No. 20.  On October 16, 2018, EPIC filed a notice

of supplemental authority in support of its opposition, pointing to specific language in the FAA

Reauthorization Act of 2018, Pub. L. No. 115-254, 132 Stat. 3, 186 (2018).  Notice Supp. Auth.

at 1, ECF No. 22.  The government filed its response on November 3, 2018.  Defs.' Resp. at 1,

ECF No. 23.

### III.  LEGAL STANDARD

#### A.  Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack

of subject matter jurisdiction.  Federal courts are courts of limited jurisdiction, and it is generally

presumed that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins.

Co. of Am.*, 511 U.S. 375, 377 (1994).  Accordingly, it is imperative that this Court "begin, and

end," with an examination of its jurisdiction. *Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448

(D.C. Cir. 2004).

It is the plaintiff's burden to establish that the court has subject matter jurisdiction over

his or her claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  In determining whether

the plaintiff has met this burden, a court must accept "the allegations of the complaint as true,"

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), and "construe the

complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from

the facts alleged[,]" *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (internal quotation

marks omitted).  However, "'the [p]laintiff's factual allegations in the complaint . . . will bear

closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to

state a claim." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14

(D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed.1987)).

## B. Failure to State a Claim

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). A motion to dismiss for failure to state a claim under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). In considering such a motion, the "complaint is construed liberally in the plaintiff['s] favor, and [the Court] grant[s] plaintiff[ ] the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994). It is not necessary for the plaintiff to plead all elements of its prima facie case in the complaint to prevail on the motion. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco,* 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to

withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

## IV.  ANALYSIS

Defendants move to dismiss EPIC's claims for lack of subject matter jurisdiction and failure to state a claim. *See* Defs.' Mot. Dismiss at 1. The Court first reviews Defendants' arguments that it lacks subject matter jurisdiction to consider EPIC's FACA claims, DJA claim, APA open meeting claims, and APA claims against the DAC, before reviewing Defendants' argument that the Complaint fails to state a claim as to the remaining APA claims. The Court ultimately agrees with Defendants' arguments on subject matter jurisdiction, but disagrees that EPIC fails to state a claim as to all of its remaining APA claims. The Court accordingly grants in part and denies in part the motion to dismiss.

### A.  Subject Matter Jurisdiction

First, Defendants move to dismiss EPIC's FACA claims, DJA claim, and APA claims premised upon the DACSC and DAC task groups' alleged failure to comply with FACA's open meeting requirements for lack of subject matter jurisdiction. *See* Defs.' Mem. Supp. Mot. Dismiss at 2, ECF No. 16-2. Defendants also argue that EPIC cannot bring claims against the DAC under the APA because the APA only provides for judicial review of "agency action." *Id.* at 27 (citing 5 U.S.C. § 702). The Court considers each argument in turn. Because it agrees with Defendants that it lacks subject matter jurisdiction to consider EPIC's FACA and DJA claims, the Court dismisses Counts I, IV, and VII of the Complaint. And because it finds that, as currently pled, EPIC lacks standing to bring its APA open meeting claims, the Court dismisses

counts II and III of the Complaint. Finally, the Court dismisses all claims against the DAC because it is not an agency under the APA.

1. FACA Claims

EPIC brings two claims for violation of FACA: Count I, for failure to open meetings to the public in violation of 5 U.S.C. app. 2 § 10(a)(1), Compl. ¶¶ 102–105; and Count IV, for failure to make records available for public inspection in violation of 5 U.S.C. app. 2 § 10(b), *id.* ¶¶ 118–123. Defendants argue that the Court lacks subject matter jurisdiction over the claims because there is no private right of action under FACA. The Court agrees.

In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court clarified the framework for federal courts to follow when determining whether a statute provides a private right of action. *Id.* at 286. In evaluating whether a statute creates a private right of action, the Court in *Sandoval* explained that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* "Absent statutory intent to create a cause of action, . . . 'courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.'" *Int'l Union, Security, Police & Fire Professionals of Am. v. Faye*, 828 F.3d 969, 972 (D.C. Cir. 2016) (quoting *Sandoval*, 532 U.S. at 286). Courts have recognized that, while clarifying which framework to apply, *Sandoval* has narrowed the set of circumstances under which a statute can be found to create a private right of action. *E.g. Klay v. Panetta*, 758 F.3d 369, 373 (D.C. Cir. 2014) (pointing to *Sandoval* as an illustration of the Supreme Court's "shift toward disfavoring judicially implied causes of action"); *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1002 (9th Cir. 2013) (noting that *Sandoval* "narrowed the framework for evaluating whether a statute implies a private cause of action"); *Lopez v. Jet Blue Airways*, 662 F.3d 593,

596 (2d Cir. 2011) (noting that *Sandoval* "strictly curtailed the authority of the courts to recognize implied rights of action").

Defendants argue in their motion to dismiss that courts to have addressed the issue since *Sandoval* have "consistently held that 'FACA does not provide a cause of action.'" Defs.' Mem. Supp. at 19 (quoting *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017)). EPIC retorts that "the D.C. Circuit has long held that 'members of the public possess enforceable rights to obtain information under FACA,'" Pl.'s Mem. Opp'n at 33 (quoting *Cummock v. Gore*, 180 F.3d 282, 289 (D.C. Cir. 1999)), and that the government is improperly relying on non-precedential district court decisions to suggest the opposite, *id.* at 34. The Court is unconvinced.

As Defendants point out in their reply brief, courts to have addressed the availability of a private right of action under FACA *after Sandoval* was decided have consistently found the statute not to create such a right. Defs.' Reply at 23; *see, e.g.*, *Ctr. for Biological Diversity*, 239 F. Supp. 3d at 221; *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 104 n.3 (D.D.C. 2017); *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 66 (D.D.C. 2017). By contrast, almost all the circuit decisions EPIC cites predate *Sandoval*. *See* Pl.'s Mem. Opp'n at 33–34 (citing cases). And the one circuit case EPIC relies on that was decided after *Sandoval*, *Nat'l Res. Def. Council v. Johnson*, 488 F.3d 1002 (D.C. Cir. 2007), involved APA claims premised on violations of FACA rather than claims invoking a private right of action based directly on FACA. *See* Compl. ¶¶ 60–63, ECF No. 1, *Nat'l Res. Def. Council v. Johnson*, No. 05-340 (D.D.C.).

As discussed above, the Supreme Court's decision in *Sandoval* both clarified and narrowed the framework for courts to evaluate claims of a private right of action under a statute. *Sandoval* makes clear that absent a clearly evinced intent to create a cause of action, courts "may not create one, no matter how desirable that might be as a policy matter." *Int'l Union*, 828 F.3d at 972 (quoting *Sandoval*, 532 U.S. at 286). The Court concurs with the reasoning of others in this circuit that "FACA does not provide a cause of action, given that none is apparent from the statutory text." *Ctr. for Biological Diversity*, 239 F. Supp. 3d at 221; *see also Lawyers' Comm.*, 265 F. Supp. 3d at 66. Accordingly, the Court dismisses Counts I and IV of the Complaint for lack of subject matter jurisdiction.

## 2. DJA Claim

Count VII of the Complaint is a claim pursuant to the DJA. Compl. ¶¶ 138–39. Defendants argue that this DJA claim should be dismissed because the Declaratory Judgment Act does not provide a private right of action, but rather provides a judicial remedy premised on another judicially remediable right. Defs.' Mem. Supp. at 18. The Court agrees.

The Declaratory Judgment Act does not provide an independent source of federal jurisdiction. *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (noting that the DJA does not provide a cause of action and that "[i]t is a 'well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction. Rather, the availability of [declaratory] relief presupposes the existence of a judicially remediable right.'" (quoting *C & E Servs., Inc. of Washington v. D.C. Water & Sewer Auth.,* 310 F.3d 197, 201 (D.C. Cir. 2002))). Accordingly, courts in this circuit have generally found that "[a] count for declaratory judgment 'is not cognizable as a separate cause of action, but is more properly included in the[] prayer for relief.'" *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 120 (D.D.C. 2013) (alteration

15

in original) (quoting *Walpin v. Corp. for Nat. & Cmty. Serv.*, 718 F. Supp. 2d 18, 24 (D.D.C. 2010)); *see also, e.g.*, *Wagdy v. Sullivan*, 316 F. Supp. 3d 257, 264 (D.D.C. 2018) (treating DJA claim as a request for relief in conjunction with other claims in complaint); *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 28 (D.D.C. 2014) (noting that DJA count is not cognizable as a separate cause of action and more properly included in prayer for relief).

Defendants argue that EPIC's DJA claim should be dismissed for lack of subject matter jurisdiction because the DJA does not confer a private right of action. Defs.' Mem. Supp. at 18. EPIC retorts that it is "still entitled to seek [declaratory] relief on the basis of its remaining claims." Pl.'s Mem. Opp'n at 34. While that is true, such relief may be sought in EPIC's prayer for relief rather than as a separate claim. The Court accordingly dismisses Count VII of the Complaint and will simply construe EPIC's request for a declaratory judgment as a portion of its prayer for relief.

### 3. APA Open Meeting Claims

Next, EPIC brings two APA claims for violations of FACA's open meeting requirements, Counts II and III. Compl. ¶¶ 107–17. Defendants argue that EPIC does not have standing to bring those claims because EPIC did not formally request to attend, or otherwise attempt to attend, any meetings of the DACSC or DAC task groups. Defs.' Mem. Supp. at 17. EPIC argues that it has established informational standing to pursue its open meeting claims. Pl.'s Opp'n at 31. The Court is not entirely convinced by Defendants' arguments, but nonetheless finds that EPIC lacks standing because the Complaint does not allege that EPIC wanted or sought to attend any of the DACSC and task group meetings.

The Court begins with the familiar requirements to establish Article III standing. Standing is a "threshold question in every federal case" that asks "whether the plaintiff has

'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). To establish Article III standing, the plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). And to establish an informational injury, which both parties agree EPIC is alleging, *see* Defs.' Mem. Supp. at 17; Pl.'s Mem. Opp'n at 32, a plaintiff must allege that "(1) it has been deprived of information that, on its interpretation, a statute requires the government . . . to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure," *Friends of Animals v. Jewel*, 828 F.3d 989, 992 (D.C. Cir. 2016).

As the D.C. Circuit explained in *Friends of Animals*, what the plaintiff must show to establish that it suffers the type of harm Congress sought to prevent "may depend on the nature of the statutory disclosure provision at issue." *Id.* With respect to FACA records requests, the Supreme Court has explained that all that is needed is for the plaintiff to seek and be denied agency records. *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) ("Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records. There is no reason for a different rule here." (internal citations omitted)); *accord FEC v. Akins*, 524 U.S. 11, 21 (1998) ("[T]his Court has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." (quoting *Public Citizen*, 491 U.S. at 449)). In evaluating FACA claims,

the D.C. Circuit has accordingly found informational standing to be established when a plaintiff requests records from an agency that it believes it is entitled to under FACA and is denied access. *E.g. Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) ("[A] refusal to provide information to which one is entitled under FACA constitutes a cognizable injury sufficient to establish Article III standing."); *Cummock*, 180 F.3d at 290 (finding particularized injury when Plaintiff "suffered an injury under FACA insofar as the Commission denied her requests for information that it was required to produce").

Here, Defendants do not contest that EPIC has established standing as to its APA claims for failure to release records under FACA. However, Defendants argue that EPIC does not have standing on its open meeting claims because "EPIC did not 'seek' to attend any meetings or otherwise attempt to enforce FACA's open meeting provisions; therefore, EPIC was not 'denied' information available at the meetings." Defs.' Mem. Supp. at 17. In essence, Defendants apply the same standard used for requests for records to the claim of injury for inability to attend meetings. The Court is not entirely convinced by this argument. As EPIC notes in its opposition, a person who seeks to attend advisory committee meetings may well be *de facto* denied information because it is impossible to "'seek' out subgroup meetings that the Government simply refuses to announce." Pl.'s Mem. Opp'n at 31. The government points to one district court case, *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 576 F. Supp. 2d 172 (D.D.C. 2008), where the plaintiffs specifically made a request to attend meetings they believed should be public pursuant to FACA. *Id.* at 177. But just because the request to attend was sufficient to confer standing in *Judicial Watch* does not mean that such a request is necessary to confer standing in all FACA open meeting claims.

At this juncture, the Court need not conclusively rule on the issue because it finds that, as currently pled, EPIC has not sought to attend the DACSC and task group meetings even under its broader theory of standing. EPIC argues that it sought to enforce the open meeting provisions when it sent its request for records to the FAA and RTCA. Pl.'s Mem. Opp'n at 31. But that request was made in March 2018, *after* the meetings EPIC identifies in its complaint and alleges should have been made open to the public. Compl. ¶ 95. The Complaint also makes clear that the request was specifically one for records, with EPIC "advis[ing] the FAA, DAC, and RTCA of its records disclosure obligations under the FACA." *Id.* ¶ 98. By contrast, the Complaint does not allege that EPIC has tried to attend any DACSC or task group meetings, or even that EPIC, before it sent its letter, wanted to attend any such meetings but was prevented from doing so by the lack of information regarding them. *See generally* Compl.[2] As the government points out, recognizing that EPIC has standing to bring its open meeting claims here would imply that everyone has standing to bring those claims, when EPIC's only allegations as to the DACSC and task group meetings are that meetings occurred, and that they should have been announced and open to the public. Defs.' Reply at 21. Absent from the complaint are allegations of *particularized* harm to EPIC, *see Lujan*, 504 U.S. at 560, which at a bare minimum would require EPIC to indicate that it had an interest in attending the DACSC and task group meetings before they took place but was unable to attend because of a lack of information available on

---

[2] In its recital of Counts II and III, EPIC does state that by failing to open DACSC and DAC Task Group meetings to the public, Defendants "have frustrated Plaintiff's longstanding mission to educate the public about the privacy implications of drone deployment and about the federal government's efforts . . . to protect the public from drone surveillance." Compl. ¶¶ 110, 122. But this general statement about Defendants frustrating EPIC's mission, which is duplicated in Counts I and IV–VII, is not sufficient to establish the particularized injury needed to create standing.

when such meetings were to take place. The Court accordingly dismisses counts II and III of the Complaint for lack of subject matter jurisdiction. [3]

### 4. APA Claims against the DAC

Finally, Defendants move to dismiss all claims against the DAC itself, which they argue is not capable of "agency action" under the APA. Defs' Mem. Supp. at 27 (quoting 5 U.S.C. § 702). The Court agrees. "An entity cannot be at once both an advisory committee and an agency." *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 33 (D.D.C. 2011) (citing *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 36 (D.D.C. 2006)). In *Freedom Watch*, the court accordingly concluded that the APA "d[id] not provide a jurisdictional grant for Freedom Watch's FACA claim" against an advisory committee, and dismissed the claims against the advisory committee for lack of subject matter jurisdiction. *Id.* EPIC does not challenge this argument, and instead contends that the DAC is properly named as a defendant "[b]ecause EPIC has stated two claims for relief under the FACA." Pl.'s Mem. Opp'n at 35. But, as discussed above in Part IV.A.1., the Court finds that FACA does not provide a private right of action. The Court accordingly dismisses all claims against the DAC for lack of subject matter jurisdiction.

### B. Failure to State a Claim

The Court next addresses Defendants' motion to dismiss for failure to state a claim Counts V and VI of the Complaint, EPIC's remaining APA claims tied to the DAC, DACSC, and DAC task groups' alleged failure to comply with FACA's public records requirements. Compl. ¶¶ 124–37. Defendants first argue that the DACSC and task groups are not advisory

---

[3] The Court recognizes that EPIC may be able to sufficiently establish standing by amending the Complaint. However, as discussed below in Part IV.B., the Court separately finds that the DACSC and task groups 1, 2, and 3 are not advisory committees, and thus are not subject to FACA's open meeting requirements. Accordingly, even if EPIC had standing to bring its APA open meeting claims, the Court would still dismiss them for failure to state a claim.

committees, and thus not subject to FACA's public records requirement. Defs.' Mem. Supp. at 21. Defendants next argue that the DAC itself has complied with FACA's public records requirements, withholding only those "preparatory" and "administrative" records that FACA does not require to be disclosed. *Id.* at 26. The Court addresses each argument in turn. The Court agrees that EPIC has not plausibly alleged that the DACSC and DAC task groups are advisory committees subject to FACA's public records requirements. However, the Complaint plausibly suggests that not all DAC records required to be made public have been produced, and the Court accordingly finds that EPIC has brought sufficiently plausible APA claims for violation of FACA. The Court accordingly denies the motion to dismiss Counts V and VI.

### 1. Records of the DACSC and DAC Task Groups

Defendants argue that the DACSC and DAC task groups are not advisory committees under FACA, and therefore are not subject to FACA's recordkeeping requirements. Defs.' Mem. Supp. at 21. EPIC makes two separate arguments in response: first, EPIC contends that all subcommittee records are records of their parent advisory committee under FACA, and therefore that it is entitled to all DACSC and DAC task group records because they are subgroups of the DAC, which Defendants agree is an advisory committee. Pl.'s Mem. Opp'n at 18. Second, EPIC argues that the DACSC and DAC task groups are themselves advisory committees, because they were established or utilized by the FAA and directly issued recommendations to the agency. *Id.* at 21. The Court first addresses, and rejects, EPIC's broader FACA argument, before reviewing whether the DACSC and DAC task groups are advisory committees under FACA. The Court concludes that they are not, and consequently that FACA does not require disclosure of DACSC and DAC task group records.

*a. Subcommittee Records as Component of Parent Committee Records*

EPIC argues that because the DACSC and DAC task groups are subgroups—or subdivisions—of the DAC, all records of the DACSC and DAC task groups are necessarily records of the DAC. Pl.'s Mem. Opp'n at 18. As a result, EPIC contends, all DACSC and DAC task group records must be made available to the public because the DAC is an advisory committee subject to FACA's public records requirements. *Id.* at 18–19. Defendants retort that EPIC's argument improperly construes FACA and its implementing regulations. Defs.' Reply at 9–10. The Court agrees.

FACA defines an advisory committee as "any committee, . . . or any subcommittee or other subgroup thereof, which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations." 5 U.S.C. app. 2 § 3(2). And while FACA only mandates that advisory committee meetings be open to the public, *id.* § 10(a)(1), the Act requires the availability for public inspection of "the records . . . or other documents which were *made available to or prepared for* or by each advisory committee, *id.* § 10(b) (emphasis added). Interpretive regulations by GSA note that "[i]n general, the requirements of [FACA] . . . do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency." 41 C.F.R. § 102-3.35. But while GSA regulations specifically note that subcommittee meetings need not comply with FACA's openness requirements if the subcommittee reports to a parent advisory committee, *id.* § 102-3.145, they do not contain a similar exception with regards to records production, where the regulations note only that "records generated by or for an advisory committee must be retained," *id.* § 102-3.175.

EPIC's argument is based primarily on a textual interpretation of the statute. If the DACSC and DAC task groups are subgroups of the DAC, then, EPIC contends, any record

belonging to such subgroup necessarily belongs to the parent group. Pl.'s Mem. Opp'n at 18 (citing *Subgroup*, Collins English Dictionary (2018)). And a record "made available to or prepared for or by" a subgroup is thus necessarily "made available to or prepared for or by" the DAC itself. *Id.* at 19. While this "commonsense conclusion," Pl.'s Mem. Opp'n at 19, may be intuitively appealing, the Court finds that it is not supported by the statute or regulations.

First, the statutory text itself does not support EPIC's conclusion. "In construing a statute, we look first for the plain meaning of the text." *United States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002). Even taking EPIC's definition of a subgroup, the Court disagrees that any record made available to or prepared for a subgroup (or subdivision of a group) is necessarily made available to or prepared for the parent group pursuant to 5 U.S.C. app. 2 § 10(b). Just because the DACSC and DAC task groups ultimately answer to the DAC does not mean that all of their documents are made available to or prepared for the DAC. For example, meeting minutes of any DACSC and DAC task group meetings would be prepared for those specific subgroups, rather than for the DAC as a whole. In addition, "the cannons of statutory interpretation instruct courts to avoid construing the text of a statute to be contradictory; 'our task is to fit, if possible, all parts into a harmonious whole.'" *Humane Soc'y of the U.S. v. McCarthy*, 209 F. Supp. 3d 280, 285 (D.D.C. 2016) (quoting *Roberts v. Seal-Land Servs., Inc.*, 566 U.S. 93, 100 (2012)). As Defendants point out, it would make little sense for FACA to provide for subgroups to separately qualify as advisory committees under § 3(2), and only for records "made available to or prepared for" an advisory committee to require public disclosure, 5 U.S.C. app. 2 § 10(b), if all subcommittee records were automatically considered records of an advisory committee. *See* Defs.' Reply at 10.

Second, both EPIC and Defendants spend a significant portion of their briefs discussing various executive documents and regulations regarding the applicability of FACA to subcommittees. Relying on 41 C.F.R. § 102-3.35, Defendants argue that the GSA regulations "expressly exclude subcommittee records from FACA's disclosure requirements." Defs.' Reply at 10. By contrast, EPIC relies on the lack of subcommittee exception to FACA's public records requirements in the CFR for the proposition that those records are necessarily included in parent committee records. Pl.'s Mem. Opp'n at 20. EPIC also points to the National Archives and Records Administration's ("NARA's") General Records Schedule 6.2, which provides for the permanent conservation as FACA records of "records that document the activities of subcommittees that support their reports and recommendations to the chartered or parent committee." General Records Schedule 6.2 at 132, Compl. Ex. 15. And it points to a GSA training presentation that indicates subcommittee records should be publicly accessible. *See* GSA FACA Training Course at 192, Compl. Ex. 16.

On the balance, the Court finds that the supplementary authority discussed by the parties supports the government's interpretation of the statute. The Court initially notes that it need not defer to interpretative regulations of a statute that were not promulgated pursuant to express statutory authority. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 33 n.4 (D.D.C. 2010). In any event, and notwithstanding the lack of subcommittee records exception in the regulations, 41 C.F.R. § 102-3.35 makes clear that GSA's interpretation is that subcommittees are not generally subject to FACA. NARA's General Records Schedule also supports the notion that not all subcommittee records are records of an advisory committee, because the schedule specifically identifies as subject to FACA "records that document the activities of subcommittees *that support their reports and recommendations to the chartered or*

*parent committee.*" General Records Schedule 6.2 at 132 (emphasis added). And, regardless, a requirement that records be preserved is not the same as a requirement that they be made public. While the GSA training presentation EPIC points to appears to contradict GSA's own interpreting regulations of FACA, that presentation does not "have the force of law sufficient to contradict its regulations." Defs.' Reply at 11.

### b. *Whether the DACSC and DAC Task Groups Are Advisory Committees*

Next, EPIC argues that DACSC and DAC task group records must be made available to the public even if they are not automatically included as records of the DAC because the DACSC and DAC task groups are themselves advisory committees subject to FACA's public records requirements. Defendants argue the Complaint does not show that the DACSC and DAC task groups were established or utilized by the FAA, or that they were intended to provide advice or recommendations directly to the FAA. Defs.' Mem. Supp. at 21–26. EPIC, on the other hand, contends that it has shown that the DACSC and DAC task groups were established or utilized by the FAA and issued recommendations directly to the FAA. Pl.'s Mem. Opp'n at 21–30. The Court finds that, regardless of whether they were "established" or "utilized" by the FAA, the Complaint fails to plausibly allege that the DACSC and DAC task groups were established or utilized "in the interest of obtaining advice or recommendations for" the FAA.[4] The Court accordingly concludes that neither the DACSC nor the DAC task groups are advisory committees, and as a result, that their records need not be made public.

---

[4] Defendants devote a substantial portion of their motion, and EPIC of its opposition, to discussing whether the DACSC and DAC task groups were "established" or "utilized" by the FAA. *See generally* Defs.' Mem. Supp. at 21–26, Pl.'s Mem. Opp'n at 21–28. The Court does not address the issue.

Pursuant to FACA, a committee (or subcommittee) becomes an advisory committee only when it is, *inter alia*, "established or utilized . . . in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2 § 3(2). The GSA's interpretive regulations regarding FACA recognize this distinction, and note that FACA generally does not apply to "subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency." 41 C.F.R. § 102-3.35; *see also* 41 C.F.R. § 102-3.145 (noting that subcommittee meetings must be open to the public when "a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations").

Two cases in this Circuit have addressed the issue. In *Nat'l Anti-Hunger Coalition v. Exec. Comm.*, 557 F. Supp. 524 (D.D.C. 1983), the plaintiffs alleged, *inter alia*, that task forces set up under the subcommittee to the Executive Committee of the President's Private Sector Survey were advisory committees. *Id.* at 529. Both the subcommittee and the Executive Committee were themselves advisory committees. *Id.* The Court explained that while the task forces were "intimately involved in the gathering of information about federal programs and the formulation of possible recommendations for the consideration of the [c]ommittee," that was not enough to render them subject to FACA absent allegations that they provided advice directly to the President or any agency. *Id.* And because the evidence provided suggested that the task forces provided only staff functions to their parent committees rather than direct advice to the government, the Court dismissed the case. *Id* at 530. The decision was upheld on appeal. *Nat'l Anti-Hunger Coalition v. Exec. Comm.*, 711 F.2d 1071 (D.C. Cir. 1983).

In *Ass'n of Am. Physicians & Surgeons v. Clinton*, 813 F. Supp. 82 (D.D.C.) *rev'd*, 997 F.2d 898 (D.C. Cir. 1993), the district court addressed claims that President Clinton's Task Force on National Health Care Reform and its subordinate working group were advisory committees. *Id.* at 84, 88. The district court held that the Task Force was an advisory committee but dismissed the claims against the working group, relying on *Anti-Hunger*. *Id.* at 88–89. The circuit reversed, finding that the Task Force consisted solely of government officials and therefore was not an advisory committee, and rejecting the argument that the working group provided staff work for the Task Force not covered by FACA. *Ass'n of Am. Physicians*, 997 F.2d at 912–13. The circuit distinguished *Anti-Hunger*, which had involved a task force subordinate to a subcommittee and Executive committee that were themselves advisory committees under FACA. *Id.* In *Anti-Hunger*, there was "less reason to focus on subordinate advisers or consultants who [were] presumably under the control of the superior groups." *Id.* at 913. By contrast, because the Task Force was entirely made up of government officials, the working group in *Ass'n of Am. Physicians* was directly subordinate to a government entity, and "it [was] the working group now that [was] the point of contact between the public and the government." *Id.*

Defendants argue that "[t]he complaint contains no allegation that the FAA intended the DAC subgroups to operate as FACA advisory groups, []that the DAC subgroups directly advised the FAA," Defs.' Mem. Supp. at 23, or that the subgroups' "recommendations would be adopted by the DAC without further deliberations," *id.* at 25. In their reply, Defendants further argue that, pursuant to *Anti-Hunger*, FACA should not apply to subcommittees like the DACSC and DAC task groups that only "provided information and recommendations for consideration to a parent committee." Defs.' Reply at 14 (citing *Anti-Hunger*, 557 F. Supp. at 529). By contrast,

EPIC asserts in the Complaint that "FAA officials have repeatedly circumvented the full DAC and worked directly with the [DACSC]," Compl. ¶ 31, as well as "personally directed, guided, participated in, and received the work and recommendations of the Task Groups," *id.* ¶ 38. The Court agrees with Defendants that the facts alleged in the Complaint and its exhibits belie those assertions.

With respect to the DACSC, the Complaint alleges that the FAA has briefed, educated, and provided guidance and assistance to the DACSC, *id.* ¶ 32, while an FAA Designated Federal Officer ("DFO") is "required by both the RTCA Charter and the FACA to be intimately involved in the proceedings of the DACSC," including calling and adjourning meetings, approving DACSC agendas, and chairing meetings when directed to do so by the FAA Administrator, *id.* ¶ 33. But as Defendants point out, *see* Defs.' Reply at 17, GSA regulations require that agencies designate a DFO to call and adjourn meetings, approve agendas, and chair meetings as requested, for *every* advisory committee and subcommittee. 41 C.F.R. § 102-3.120. The authority of the FAA DFO over DACSC and DAC task groups meetings therefore does not suggest that the FAA bypassed the DAC in obtaining advice and recommendations. And the fact that FAA officials may have briefed, educated, or provided guidance and assistance to the DACSC does not mean that the DACSC bypassed the DAC and advised the FAA directly. The exhibits to the Complaint suggest the opposite: the DACSC's Terms of Reference indicate that its purpose was to "support the DAC in developing consensus-based recommendations to the FAA" by "provid[ing] the staff work for the DAC, applying knowledge and expertise to forge consensus on critical issues and providing input to the DAC for public deliberation and the development of recommendations." DACSC Terms of Reference at 1. The Terms of Reference also made clear that the DACSC would act at the DAC's direction, with all its recommendations to be vetted and

approved at DAC meetings.  *Id.* at 3.  And DAC meeting minutes included as exhibits to EPIC's

complaint confirm that the DACSC briefed the DAC on several occasions.  *E.g.* January 31,

2017 Meeting Minutes; November 8, 2017 Meeting Minutes.

Here, EPIC has not alleged any fact that suggests the DACSC was established or utilized

directly for the purpose of obtaining advice or recommendations for the FAA.  Like the task

forces in *Anti-Hunger*, the DACSC was set up specifically to conduct staff work for the DAC,

with a clearly established hierarchical structure mandating for all recommendations to be

approved by the DAC.  And unlike the working group in *Ass'n of Am. Physicians*, the DACSC is

subordinate to an advisory committee that forms "the point of contact between the public and the

government."  997 F.2d at 913.  The DACSC provided reports of its activities at public DAC

meetings, and so did its component task groups.  Absent any allegation that the DACSC

provided advice or recommendations directly to the FAA—beyond the conclusory assertion that

"FAA officials have repeatedly circumvented the full DAC"—the Complaint does not plead

sufficient facts to plausibly suggest that the DACSC was an advisory committee.

The facts alleged with respect to the DAC task groups dictate the same conclusion.  EPIC

alleges that the FAA issued detailed tasking statements for each task group, including fact-

finding assignments, topics each task group should advise on, and deadlines to deliver

recommendations and reports.  Compl. ¶ 39.  And it also alleges that because the task groups

were subcommittees of the DAC, the designated FAA DFO had the same powers over them as

over the DACSC.  *Id.* ¶ 41.  As discussed above, GSA regulations require agencies to designate a

DFO with such authority over the meetings of every subcommittee of an advisory committee.

*See* 41 C.F.R. § 102-3.120.  And as with the DACSC, exhibits to the complaint indicate that the

DAC task groups were established as, and functioned as, subordinate groups to the DAC.  The

DACSC Terms of Reference, while noting that the DACSC would coordinate the work of the DAC task groups, DACSC Terms of Reference at 1, stated that "[n]o recommendations w[ould] flow directly from the . . . DAC TGs directly to the FAA," *id.* at 3. The task groups presented reports and substantive recommendations for review by the DAC at multiple DAC meetings. *E.g.* Compl. ¶¶ 63, 75. These substantive recommendations were not simply rubber-stamped and accepted wholesale by the DAC; they were discussed and sometimes amended prior to final approval and forwarding to the FAA. *E.g.* January 31, 2017 DAC Meeting Minutes at 12–13; May 3, 2017 DAC Meeting Minutes at 9–14, 17.

Even more so than with the DACSC, these facts point to the conclusion that the DAC task groups did not provide advice or recommendations directly to the FAA and are therefore not advisory committees under FACA. As in *Anti-Hunger*, the task forces were subordinate to two layers of advisory committees. The D.C. Circuit's suggestion that there is "less reason to focus on subordinate advisers or consultants who [were] presumably under the control of the superior groups," *American Ass'n of Physicians*, 997 F.2d at 913, is thus even stronger. EPIC points to the significant work conducted by the task groups and to the limited discussion of some of their recommendations before approval at DAC meetings to argue that they did not merely provide staff work—and essentially that they were directly advising the FAA. Pl.'s Mem. Opp'n at 29. The Court is not convinced by the argument, when the DAC suggested changes to task group recommendations, *e.g.* May 3, 2017 Meeting Minutes at 17 (noting direction to Task Group 2 to adjust recommendation), and where some of the more contentious task group recommendations received extensive discussion, *e.g.* November 8, 2017 Meeting Minutes at 8–10 (discussing Task Group 1's fragmented recommendations). And the Complaint does not allege that the DAC "rubber-stamped" or acted as a meaningless conduit between the DAC task groups and the FAA.

The Court accordingly finds that the Complaint fails to allege facts that plausibly support the claim that the DAC task groups are advisory committees under FACA. [5]

## 2. Records of the DAC

In their motion to dismiss, Defendants do not address EPIC's claims as they relate to records of the DAC. *See generally* Defs.' Mem. Supp. EPIC argues in its opposition that it has plausibly stated a claim with respect to DAC records, Pl.'s Mem. Opp'n at 14, while Defendants contend in their reply that the limited references to records of the DAC (as opposed to the DACSC and DAC task groups) in the Complaint are insufficient to state a claim, Defs' Reply at 3–9. The Court finds that EPIC has sufficiently pled its remaining APA claims as to the DAC for the claims to survive the motion to dismiss.

The Complaint contains only sparse reference to records of the DAC itself. EPIC asks for "[a]ccess to the[] nonpublic . . . records" of the DAC in the Complaint, Compl. ¶ 3, and contends that "the vast majority of DAC records . . . remain closed to the public," *id.* ¶ 23. EPIC mentions that it requested DAC records from Defendants on March 20, 2018, and never received a reply. *Id.* ¶¶ 95–99. And in its recitation of Counts IV, V, and VI, EPIC states that Defendants have failed to make available records of the DAC, "including but not limited to records arising out of the DACSC and DAC Task Groups." *E.g. id.* ¶ 125. In its opposition, EPIC also points to

---

[5] In its Notice of Supplemental Authority, EPIC points to a section of the FAA Reauthorization Act of 2018, Pub. L. No. 115-254, 132 Stat. 3, 186 (2018), which charges the Comptroller General of the United States with conducting a study on possible fee-based mechanisms for recovering costs associated with regulating and providing air navigation services to drones. Pl.'s Notice of Supplemental Authority at 1. EPIC points out that the Comptroller General is explicitly required to consider the recommendations of DAC Task Group 3 as part of the study. *Id.* This supplemental authority does not change the Court's analysis because, as Defendants point out, exhibits to the Complaint indicate that Task Group 3's recommendations were discussed and approved at a full meeting of the DAC prior to submission to the FAA. *See* Defs.' Resp. at 2.

multiple records of the DAC referenced in exhibits to the Complaint, which it alleges have not been made available to the public. Pl.'s Mem. Opp'n at 16–18. These records include documents shared in an online workspace the DAC made available to its members "to facilitate the consensus process of the committee," *id.* at 16, a legal fact sheet prepared by the FAA, *id.* at 17, RTCA SC-228 briefing materials, *id.*, and records of "listening sessions" meetings organized by Task Group 3 and attended by DAC members, *id.*

In their reply, Defendants argue that the limited reference to the records of the DAC in the Complaint is insufficient to support EPIC's claims, because the allegations referencing the DAC are merely conclusory statements and "bald allegations" of a "conclusory nature." Defs.' Reply at 5 (quoting *Iqbal*, 556 U.S. at 681). Defendants point out that most of the references to DAC records in the Complaint are included as part of formulaic recitations of the types of documents required to be produced under 5 U.S.C. app. 2 § 10(b). *Id.* They argue that at least one, and potentially two, of the documents identified by EPIC in its opposition have already been produced. *Id.* at 6 n.2. And as to the other documents EPIC specifically points to in its opposition, Defendants argue that "it would be entirely consistent with FACA" if they were not released, *id.* at 7, because they are most likely "preparatory work" or "administrative work" not subject to FACA's disclosure requirements pursuant to GSA's interpretive regulations. *Id.* at 7–9 (citing 41 C.F.R. § 102–3.160).

The Court is unconvinced by Defendants' arguments, for two reasons. First, while it agrees that the Complaint contains only very limited references to DAC records, the Court notes that EPIC alleges it made a request for DAC records that Defendants entirely ignored. *See* Compl. ¶¶ 95–99. Defendants argue that the Complaint and its exhibits "establish that numerous records of the DAC . . . were made available to the public," which they contend "readily support

the legal conclusion that [D]efendants fully complied with FACA's disclosure requirements."

Defs.' Reply at 4. But it would be difficult for EPIC to specifically identify records that were not published when those records are not public in the first place, and when Defendants refuse to provide the full list of records they believe are required to be published. Instead, EPIC identifies a request it has made for public inspection, to which Defendants failed to reply—other than with their assertion in briefs in this lawsuit that all required records have been made public. For the same reason that FOIA cases are "typically and appropriately . . . decided on motions for summary judgment," *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C 2009), because the Court can then identify what documents have been withheld and why, the failure to make available any DAC documents for review militates in favor of EPIC's claims surviving the motion to dismiss stage.

Second, the Court does not find persuasive Defendants' argument that it "would be entirely consistent with FACA" for them not to release the documents EPIC identified as improperly withheld from the public in its opposition. Defs.' Reply at 7.[6] Defendants rely on a regulation contained in Subpart D of GSA's interpretive regulations of FACA, "Advisory Committee Meeting and Recordkeeping Procedures," for the notion that preparatory and administrative records of advisory committees are not covered by FACA. *See* Defs.' Reply at 8; 41 C.F.R. § 102–3.160. The regulation indicates that preparatory work and administrative work are excluded "from the procedural requirements contained in this Subpart." 41 C.F.R. § 102–

---

[6] Defendants separately argue that the FAA legal fact sheet identified by EPIC in its opposition is already publicly available on the FAA's website, and provide a link to that fact sheet. *See* Defs.' Reply at 6 n.2. The Court notes that the link is currently nonfunctional. *See* Page Not Found, FAA, https://www.faa.gov/uas/resources/uas_regulations_policy/media/uas_fact_sheet_final.pdf. Regardless, this is an argument better made on a full record at the motion for summary judgment stage.

3.160.  However, § 102–3.160 is entitled "What activities of an advisory committee are not subject to *the notice and open meeting requirements* of the Act?"  *Id.* (emphasis added). And "preparatory work" and "administrative work" are both defined as "*[m]eetings* of two or more advisory committee or subcommittee members" conducted for specific purposes.  *Id.* (emphasis added).  The Court is thus not convinced that § 102–3.160 actually justifies withholding records from publication under FACA because they are preparatory or of an administrative nature.  In fact, the broad list of documents required to be made public by the statute, including preparatory documents such as drafts or agendas, suggests that there is no such exception.  *See* 5 U.S.C. app. 2 § 10(b).  And even if such an exception to the public records requirement is justified under the statute, the Court cannot determine that the exception applies simply by accepting the government's unsworn arguments contained in a legal brief that all documents shared in the DAC workspace, and all documents created in connection with Task Group 3 listening sessions, were preparatory or administrative in nature.  *See* Defs.' Reply at 8–9.

Because EPIC has sufficiently pled its APA claims relating to Defendants' failure to release DAC records, the Court denies the motion to dismiss as to counts V and VI.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 16) is **GRANTED IN PART AND DENIED IN PART**.  The Court dismisses Counts I, II, III, IV, and VII of the Complaint, and dismisses all claims against the Drone Advisory Committee.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 25, 2019                                     RUDOLPH CONTRERAS
                                                                             United States District Judge